Volume 1 of 2

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellant,*

v.

ZACARIAS MOUSSAOUI, a/k/a Shaqil,
a/k/a Abu Khalid al Sahrawi,
                    *Defendant-Appellee,*

    No. 03-4792

CENTER FOR NATIONAL SECURITY
STUDIES,
                    *Amicus Supporting Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-01-455)

Argued: December 3, 2003

Decided: September 13, 2004

Before WILKINS, Chief Judge, and WILLIAMS and
GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.
Chief Judge Wilkins announced the judgment of the court and wrote
an opinion, in which Judge Williams concurs, and in which Judge
Gregory concurs except as to Part V.C. Judge Williams wrote a con-

curring opinion. Judge Gregory wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Paul D. Clement, Deputy Solicitor General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Frank Willard Dunham, Jr., Federal Public Defender, Alexandria, Virginia; Edward Brian MacMahon, Jr., Middleburg, Virginia, for Appellee. **ON BRIEF:** Christopher A. Wray, Assistant Attorney General, Patrick F. Philbin, Associate Deputy Attorney General, Jonathan L. Marcus, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Paul J. McNulty, United States Attorney, Robert A. Spencer, Assistant United States Attorney, Kenneth M. Karas, Assistant United States Attorney, David J. Novak, Assistant United States Attorney, Alexandria, Virginia, for Appellant. Gerald T. Zerkin, Jr., Senior Assistant Federal Public Defender, Kenneth P. Troccoli, Assistant Federal Public Defender, Anne M. Chapman, Assistant Federal Public Defender, Alexandria, Virginia, Alan H. Yamamoto, Alexandria, Virginia, for Appellee. Kathleen Clark, Joseph Onek, CENTER FOR NATIONAL SECURITY STUDIES, Washington, D.C., for Amicus Curiae.

## OPINION

WILKINS, Chief Judge:

The Government appeals a series of rulings by the district court granting Appellee Zacarias Moussaoui access to certain individuals[1] ("the enemy combatant witnesses" or "the witnesses") for the purpose of deposing them pursuant to Federal Rule of Criminal Procedure 15; rejecting the Government's proposed substitutions for the depositions;

---

[1]The names of these individuals are classified, as is much of the information pertinent to this appeal. We have avoided reference to classified material to the greatest extent possible. Where classified information has been redacted, it has been noted by brackets.

and imposing sanctions for the Government's refusal to produce the witnesses. We are presented with questions of grave significance—questions that test the commitment of this nation to an independent judiciary, to the constitutional guarantee of a fair trial even to one accused of the most heinous of crimes, and to the protection of our citizens against additional terrorist attacks. These questions do not admit of easy answers.

For the reasons set forth below, we reject the Government's claim that the district court exceeded its authority in granting Moussaoui access to the witnesses. We affirm the conclusion of the district court that the enemy combatant witnesses could provide material, favorable testimony on Moussaoui's behalf, and we agree with the district court that the Government's proposed substitutions for the witnesses' deposition testimony are inadequate. However, we reverse the district court insofar as it held that it is not possible to craft adequate substitutions, and we remand with instructions for the district court and the parties to craft substitutions under certain guidelines. Finally, we vacate the order imposing sanctions on the Government.

I.

A. *Background Information*

On September 11, 2001, members of the terrorist organization al Qaeda[2] hijacked three passenger aircraft and crashed them into the Pentagon and the World Trade Center towers in New York. A fourth plane, apparently destined for the United States Capitol, crashed in Pennsylvania after passengers wrested control from the hijackers. The attacks resulted in the deaths of over 3000 men, women, and children.

Moussaoui was arrested for an immigration violation in mid-August 2001 and, in December of that year, was indicted on several charges of conspiracy related to the September 11 attacks. In July 2002, the Government filed a superceding indictment charging Moussaoui with six offenses: conspiracy to commit acts of terrorism tran-

---

[2]The name "al Qaeda" is transliterated from Arabic. Several spellings may be acceptable for transliterated terms; this opinion adopts the spelling conventions employed by the district court and the parties.

scending national boundaries, *see* 18 U.S.C.A. § 2332b(a)(2), (c) (West 2000); conspiracy to commit aircraft piracy, *see* 49 U.S.C.A. § 46502(a)(1)(A), (a)(2)(B) (West 1997); conspiracy to destroy aircraft, *see* 18 U.S.C.A. §§ 32(a)(7), 34 (West 2000); conspiracy to use weapons of mass destruction, *see* 18 U.S.C.A. § 2332a(a) (West 2000 & Supp. 2003); conspiracy to murder United States employees, *see* 18 U.S.C.A. §§ 1114, 1117 (West 2000 & Supp. 2003); and conspiracy to destroy property, *see* 18 U.S.C.A. § 844(f), (i), (n) (West 2000 & Supp. 2003). The Government seeks the death penalty on the first four of these charges.

According to the allegations of the indictment, Moussaoui was present at an al Qaeda training camp in April 1998. The indictment further alleges that Moussaoui arrived in the United States in late February 2001 and thereafter began flight lessons in Norman, Oklahoma. Other allegations in the indictment highlight similarities between Moussaoui's conduct and the conduct of the September 11 hijackers. Each of the four death-eligible counts of the indictment alleges that the actions of Moussaoui and his coconspirators "result[ed] in the deaths of thousands of persons on September 11, 2001." *E.g.*, J.A. (03-4162) 108.[3]

## B. *Events Leading to this Appeal*

Simultaneously with its prosecution of Moussaoui, the Executive Branch has been engaged in ongoing efforts to eradicate al Qaeda and

---

[3]The materials before us include numerous joint appendices from both this and the previous appeal. We will cite such materials as follows. An appendix will be cited either J.A., to denote an unclassified appendix, or J.A.C., to denote a classified appendix. This designation will be followed by a parenthetical reference to the docket number of the appeal to which the appendix relates. For example, a reference to page 26 the unclassified joint appendix from the previous appeal would be denoted "J.A. (03-4162) 26"; a reference to page 300 of the classified appendix from the current appeal would be denoted "J.A.C. (03-4792) 300." References to supplemental appendices will include the designation "Supp."—for example, "Supp. J.A.C. (03-4162) 25." The Government's classified appendix on rehearing will be cited as "J.A.C. (03-4792/Reh'g)," with the appropriate page number following the parenthetical.

to capture its leader, Usama bin Laden. These efforts have resulted in the capture of numerous members of al Qaeda, including the witnesses at issue here: [            ]
("Witness A"),
[                    ] ("Witness B"), [
              ] and [                   ] ("Witness C"), [



              ]

Witness    A    was    captured    [        ].    Shortly thereafter, Moussaoui (who at that time was representing himself in the district court) moved for access to Witness A, asserting that the witness would be an important part of his defense. Moussaoui's motion was supported by then-standby counsel, who filed a motion seeking pretrial access to Witness A and a writ of habeas corpus *ad testificandum* to obtain Witness A's trial testimony. The Government opposed this request.[4]

The district court conducted a hearing, after which it issued an oral ruling granting access to Witness A ("the January 30 order"). The court subsequently issued a memorandum opinion explaining its ruling in greater detail. The district court concluded that Witness A could offer material testimony in Moussaoui's defense; in particular, the court determined that Witness A had extensive knowledge of the September 11 plot and that his testimony would support Moussaoui's claim that he was not involved in the attacks. At a minimum, the court observed, Witness A's testimony could support an argument that Moussaoui should not receive the death penalty if convicted.

The district court acknowledged that Witness A is a national security asset and therefore denied standby counsel's request for unmonitored pretrial access and declined to order his production at trial. The court also determined, however, that the Government's national

---

[4]Moussaoui and standby counsel also sought access to other al Qaeda members accused of complicity in the 9/11 attacks. The district court denied these requests on the basis that Moussaoui and standby counsel had failed to demonstrate that these individuals could provide material, admissible testimony. Those rulings are not before us.

security interest must yield to Moussaoui's right to a fair trial. Accordingly, the court ordered that Witness A's testimony be preserved by means of a Rule 15 deposition. *See* Fed. R. Crim. P. 15(a)(1) (providing that court may order deposition of witness to preserve testimony for trial "because of exceptional circumstances and in the interest of justice"). In an attempt to minimize the effect of its order on national security, the district court ordered that certain precautions be taken. Specifically, the court directed that the deposition would be taken by remote video, with Witness A in an undisclosed location and Moussaoui, standby counsel, and counsel for the Government in the presence of the district court, [

]

   While the Government's appeal of the January 30 order was pending before this court, we remanded for the purpose of allowing the district court to determine whether any substitution existed that would place Moussaoui in substantially the same position as would a deposition. On remand, both the Government and standby counsel offered proposed substitutions for Witness A's deposition testimony.[5] The district court rejected the Government's proposed substitutions, reasoning that (a) the information in the [      ] reports was unreliable, and (b) the substitutions themselves were flawed in numerous respects. Believing itself bound to consider only the Government's proposed substitutions, the district court did not review the substitutions offered by standby counsel.

---

[5]These substitutions were derived as follows. Those responsible [                                        ] have recorded the witnesses' answers to questions in [      ] reports. These highly classified reports are intended for use in the military and intelligence communities; they were not prepared with this litigation in mind. Portions of the [      ] reports concerning Moussaoui and the September 11 attacks have been excerpted and set forth in documents prepared for purposes of this litigation. These documents, deemed [      ] summaries" by the parties and the district court, have been provided to defense counsel in conformance with the Government's obligations under *Brady v. Maryland*, 373 U.S. 63 (1963). The proposed substitutions are based on the [      ] summaries.

The proceedings on remand complete, we conducted oral argument on June 3, 2003. Shortly thereafter, we dismissed the appeal as interlocutory. *See United States v. Moussaoui* (*Moussaoui I*), 333 F.3d 509, 517 (4th Cir. 2003). Upon receiving the mandate of this court, the district court entered an order directing the Government to inform the court whether it would comply with the January 30 order. On July 14, 2003, the Government filed a pleading indicating that it would refuse to provide access to Witness A for the purpose of conducting a deposition.

On August 29, the district court entered an order ("the August 29 order") granting access to Witnesses B and C for purposes of conducting Rule 15 depositions of those witnesses. The order imposed the same conditions as those applicable to Witness A. The court also directed the Government to file any proposed substitutions for the witnesses' testimony by September 5, and it directed standby counsel to file any response to the substitutions by September 12.

On September 8, the district court rejected the Government's proposed substitutions without requiring any response from the defense. The court stated that the Government's proposed substitutions for the deposition testimony of Witnesses B and C failed for the same reasons as the Government's proposed substitutions for the deposition testimony of Witness A. Following the rejection of its proposed substitutions, the Government informed the court that it would not comply with the August 29 order.

The district court then directed the parties to submit briefs concerning the appropriate sanction to be imposed for the Government's refusal to comply with the January 30 and August 29 orders. Standby counsel sought dismissal but alternatively asked the district court to dismiss the death notice. The Government filed a responsive pleading stating that "[t]o present the issue most efficiently to the Court of Appeals, and because [the Classified Information Procedures Act] prescribes dismissal as the presumptive action a district court must take in these circumstances, we do not oppose standby counsel's suggestion that the appropriate action in this case is to dismiss the indictment." J.A.C. (03-4792) 487; *see id.* (asserting that "dismissal of the indictment . . . is the surest route for ensuring that the questions at issue here can promptly be presented to the Fourth Circuit").

Noting that "[t]he unprecedented investment of both human and material resources in this case mandates the careful consideration of some sanction other than dismissal," J.A. (03-4792) 319, the district court rejected the parties' claims that the indictment should be dismissed. Rather, the court dismissed the death notice, reasoning that Moussaoui had adequately demonstrated that the witnesses could provide testimony that, if believed, might preclude a jury from finding Moussaoui eligible for the death penalty. Further, because proof of Moussaoui's involvement in the September 11 attacks was not necessary to a conviction, and because the witnesses' testimony, if believed, could exonerate Moussaoui of involvement in those attacks, the district court prohibited the government "from making any argument, or offering any evidence, suggesting that the defendant had any involvement in, or knowledge of, the September 11 attacks." *Id.* at 327. In conjunction with this ruling, the district court denied the Government's motions to admit into evidence cockpit voice recordings made on September 11; video footage of the collapse of the World Trade Center towers; and photographs of the victims of the attacks.

The Government appealed, attacking multiple aspects of the rulings of the district court.[6]

## C. *Events Leading to Issuance of this Amended Opinion*

We issued our decision on April 22, 2004. *See United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004). Moussaoui thereafter timely filed a petition for rehearing and suggestion for rehearing en banc (the Petition). On May 12, the Government submitted a letter to the court purporting to "clarify certain factual matters." Letter to Deputy Clerk from United States Attorney at 1 (May 12, 2004) [hereinafter "Letter"]. In particular, the Government referred to pages 50-51 of the classified slip opinion, where the court stated:

---

[6]Shortly before we heard oral argument on this appeal, the district court vacated its order granting Moussaoui's request to represent himself and appointed standby counsel as counsel of record. Accordingly, for the remainder of this opinion we will follow our usual practice and refer to Moussaoui and his attorneys collectively as "Moussaoui," except where necessary for the sake of clarity.

[

]

Slip op. at 50-51 (emphasis added);[7] *see id.* at 55-56 [

]

In response to the emphasized portion of the above quotation, the Government stated that

> members of the prosecution team, including FBI Special Agents assigned to the September 11 and other related investigations, [

---

[7]Citations to "Slip op." refer to the unredacted opinions of the court as issued on April 22.

[

]

] have provided [          ] information [

                                                    ]

consistent with the [                               ] desire to
maximize their own efforts to obtain actionable information
[          ]

Letter at 2.[9] The Government went on to note, however, that "[a]ny information or suggested areas of inquiry that have been shared [                               ] have been used, like information from numerous other sources, at the sole discretion [

] *Id.* at 3. The Government asserted that [

] *Id.*

Based in part on the revelations in the May 12 letter, we directed the Government to file a response to the Petition. In particular, we directed the Government to provide answers to the following questions:

  (1)   Why was the information in the May 12 Letter not provided to this court or the district court prior to May 12?

  (2)   [

                                                    ]

---

[9]The Government also noted that it had been "'privy to the [          ] process,'" Letter at 1 (quoting slip op. at 51), [

                                                    ]

(3) [

]

(4) [

] provided inculpatory or exculpatory information regarding Moussaoui?

(5) In light of the information contained in the Letter and any other pertinent developments, would it now be appropriate to submit written questions to any of the enemy combatant witnesses?

(6) What restrictions would apply to such a process and how should it be conducted?

(7) If access is granted by written questions, is the Compulsory Process Clause satisfied?

(8) If access is granted by written questions, what effect, if any, would *Crawford v. Washington*, 124 S. Ct. 1354 (2004), have on such a process?

(9) If circumstances have changed such that submission of written questions is now possible, when did the circumstances change and why was neither this court nor the district court so informed at that time?

*See United States v. Moussaoui*, No. 03-4792 (4th Cir. May 13, 2004) (order directing response to petition for rehearing and suggestion for rehearing en banc). Underlying this order were concerns among the panel members that members of the prosecution team may have [

] rendered the witnesses' statements less reliable.

The Government filed its response (the Response), supplemented by a classified joint appendix and a classified ex parte appendix, on May 19. Moussaoui filed a reply on May 24, in which, *inter alia*, he raised concerns [

]

We conducted a sealed oral argument regarding the petition for rehearing on June 3, 2004. During a discussion [
          ] the panel asked the Government to provide documentation [

] On June 16, the Government filed, an ex parte document responding to this request.[10]

D. *Additional Facts Contained in the Government's Submissions in Response to the Petition*

1. *Agent Zebley and the PENTTBOM Team*

The FBI team investigating the terrorist attacks of September 11, 2001 is known as "the PENTTBOM team." The Government considers these investigators to be part of the prosecution team. *See* Letter at 2.

One member of the PENTTBOM team, Special Agent Aaron Zebley, responded to the World Trade Center on September 11 and has been involved in the investigation ever since. Agent Zebley's particular duty for the PENTTBOM team has been to investigate the al Qaeda cell in Hamburg, Germany [          ] Within the PENTTBOM team, Agent Zebley is regarded as having special expertise and knowledge regarding Witness A. Since November 2001 (one month prior to Moussaoui's indictment), Agent Zebley has been a case agent for the Moussaoui prosecution.

---

[10]On June 17, Moussaoui filed a letter objecting to the circumstances under which this document was submitted to the court. Because this letter was not styled as a motion, it is not clear to us that Moussaoui seeks any relief from this court. To the extent he does seek relief, however, his request is denied.

The classified joint appendix submitted by the Government with the Response includes [

---

[11][
                                                                          ]

]

## 2. *Oral Communications*

[

]

### 3. *Written Communications*

[

]
]

4. *Intelligence Community Use of Information*

[


]**[12]** [


] the
intelligence community is interested only in obtaining information

---

**[12]** After the Petition was filed, news articles indicated that the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission") had submitted questions to be asked of unidentified al Qaeda detainees. *See* Philip Shenon, "Accord Near for 9/11 Panel to Question Qaeda Leaders," *N.Y. Times*, May 12, 2004, at A20 (reporting a statement by the 9/11 Commission that it was "close to an agreement with the Bush administration that would allow the panel to submit questions to captured Qaeda leaders who are believed to have been involved in planning the attacks"); *see also* Associated Press, "Vice Chairman Expects Responses to Written Questions Soon" (May 13, 2004), *available at www.msnbc.msn.com/id/4972789* (stating that "[t]he Sept. 11 commission has submitted written questions about the 2001 attacks to al-Qaida detainees and expects to receive responses soon"). [


] *See* Nat'l Comm'n on Terrorist Attacks Upon the United States, *Staff Statement No. 16*, at 1 (released June 16, 2004) (stating that Commission had no "direct access" to al Qaeda members but rather relied on written materials).

that has foreign intelligence value; the intelligence community is not concerned with obtaining information to aid in the prosecution of Moussaoui. [                                    ] not create special [        ] reports for use by the prosecution; rather, the prosecution and the PENTTBOM team receive the same reports that are distributed to the intelligence community at large. Information is included in        these        reports        only        if        [        ] the information to have foreign intelligence value.[14]

[

]

J.A.C. (03-4792/Reh'g) 48-49.

[14]The Government's submissions indicate that those responsible for [        ] the witnesses record and pass on only information [        ] to have foreign intelligence value. Consequently, it is at least possible, albeit unlikely, that one of the witnesses has imparted significant exculpatory information related to Moussaoui that has not been included [        ] If so, there may be a due process problem under *Brady v. Maryland*, 373 U.S. 83 (1963). *See United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991) (stating that prosecution is obligated under *Brady* to disclose all exculpatory information "in the possession of some arm of the state"). We need not consider this question, however, as there is no evidence before us that the Government possesses exculpatory material that has not been disclosed to the defense.

II.

Before turning to the merits, we consider the preliminary question of our jurisdiction. The parties do not dispute that we have jurisdiction over the present appeal. Nevertheless, because this is an interlocutory appeal, and in view of our prior dismissal for lack of an appealable order, we will examine the question. *See Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 635 (4th Cir.), *cert. denied*, 537 U.S. 1087 (2002).

In the previous appeal, we concluded that we lacked jurisdiction because (1) the Classified Information Procedures Act (CIPA), 18 U.S.C.A. App. 3 §§ 1-16 (West 2000 & Supp. 2003)—§ 7(a) of which authorizes an interlocutory appeal from certain orders of the district court regarding the disclosure of classified information—did not apply; (2) the order of the district court was not a collateral order appealable under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949); and (3) mandamus jurisdiction was not appropriate. In the present appeal, the Government asserts that this court has jurisdiction pursuant to CIPA, the collateral order doctrine, and 18 U.S.C.A. § 3731 (West Supp. 2003). Because we conclude that jurisdiction for this appeal lies under § 3731, we need not address the Government's other proposed bases for jurisdiction.

Section 3731 allows the Government to pursue an interlocutory appeal of certain pretrial rulings of the district court in a criminal case. The first paragraph of § 3731 provides, in pertinent part, that "[i]n a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information . . . as to any one or more counts, or any part thereof." 18 U.S.C.A. § 3731. The second paragraph of the statute allows the United States to appeal a pretrial order suppressing or excluding evidence, provided "the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." *Id.* Section 3731 requires courts to construe its provisions "liberally" in order "to effectuate its purposes." *Id.*; *see United States v. Wilson*, 420 U.S. 332, 337-39 (1975) (holding that, in enacting § 3731, Congress intended to remove all barriers to

a Government appeal in a criminal case other than those imposed by the Constitution).

The district court sanctioned the Government for refusing to produce the enemy combatant witnesses for depositions by dismissing the death notice and excluding specific items of evidence. Both aspects of the sanction are appealable under § 3731—the latter under the text of the statute itself, and the former by liberal construction of the term "dismissing." *See United States v. Quinones*, 313 F.3d. 49, 56-57 (2d Cir. 2002) (holding dismissal of death notice appealable under § 3731), *cert. denied*, 124 S. Ct. 807 (2003); *United States v. Bass*, 266 F.3d 532, 535-36 (6th Cir. 2001) (same), *rev'd on other grounds*, 536 U.S. 862 (2002) (per curiam); *United States v. Acosta-Martinez*, 252 F.3d 13, 16-17 (1st Cir. 2001) (same); *United States v. Cheely*, 36 F.3d 1439, 1441 (9th Cir. 1994) (same).

### III.

With respect to the merits, the Government first argues that the district court erred in ordering the production of the enemy combatant witnesses for the purpose of deposing them. Within the context of this argument, the Government makes two related claims. First, the Government asserts that because the witnesses are noncitizens outside the territorial boundaries of the United States, there is no means by which the district court can compel their appearance on Moussaoui's behalf. Second, the Government maintains that even if the district court has the power to reach the witnesses, its exercise of that power is curtailed by the reality that the witnesses are in military custody in time of war, and thus requiring them to be produced would violate constitutional principles of separation of powers. We address these arguments seriatim.

### A. *Process Power*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The compulsory process right is circumscribed, however, by the ability of the district court to obtain the presence of a witness through service of process. *See United States v. Greco*, 298 F.2d 247, 251 (2d Cir.

1962) ("[T]he Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it."). The Government maintains that because the enemy combatant witnesses are foreign nationals outside the boundaries of the United States, they are beyond the process power of the district court and, hence, unavailable to Moussaoui.

The Government's argument rests primarily on the well established and undisputed principle that the process power of the district court does not extend to foreign nationals abroad. *See United States v. Theresius Filippi*, 918 F.2d 244, 246 n.2 (1st Cir. 1990) ("The United States has no subpoena power over a foreign national in a foreign country."). Were this the governing rule, Moussaoui clearly would have no claim under the Sixth Amendment. *See United States v. Zabaneh*, 837 F.2d 1249, 1259-60 (5th Cir. 1988) ("It is well established . . . that convictions are not unconstitutional under the Sixth Amendment even though the United States courts lack power to subpoena witnesses, (other than American citizens) from foreign countries."). This is not the controlling principle, however.

The Government's argument overlooks the critical fact that the enemy combatant witnesses are [                    ] of the United States Government.[15] Therefore, we are concerned not with the ability of the district court to issue a subpoena to the witnesses, but rather with its power to issue a writ of habeas corpus *ad testificandum* ("testimonial writ") to the witnesses' custodian. *See* 28 U.S.C.A. § 2241(c)(5) (West 1994); *United States v. Cruz-Jiminez*, 977 F.2d 95, 99-100 (3d Cir. 1992) (explaining that when a defendant asserts a Sixth Amendment right to the testimony of an incarcerated witness, the district court may obtain the witness' testimony by issuing a testimonial writ).

In determining whether a district court possesses the power to serve a writ of habeas corpus, the critical principle is that the writ is served not upon the prisoner, but upon the custodian. *See Braden v. 30th Jud. Cir. Ct.,*, 410 U.S. 484, 494-95 (1973) ("The writ of habeas corpus

---

[15]The Government will neither confirm nor deny that the witnesses are [                    ] However, it concedes, and we agree, that for purposes of this appeal we must assume that the witnesses are [          ]

does not act upon the prisoner who seeks relief, but upon the person who holds him in . . . custody."). As the Supreme Court has noted, "The important fact to be observed in regard to the mode of procedure upon this writ is, that it is directed to, and served upon, not the person confined, but his jailer. It does not reach the former except through the latter." *Ex Parte Endo*, 323 U.S. 283, 306 (1944) (internal quotation marks omitted); *see* 28 U.S.C.A. § 2243 (West 1994) (providing that a writ of habeas corpus "shall be directed to the person having custody of the person detained"). Therefore, the relevant question is not whether the district court can serve the *witnesses*, but rather whether the court can serve the *custodian*.[16]

## B. *Person to be Served*

Ordinarily, a habeas writ must be served on a prisoner's immediate custodian—"the individual with day-to-day control over" the prisoner.

---

[16]At oral argument, the Government described the capture of the enemy combatant witnesses as "a windfall" from which Moussaoui should not be entitled to benefit. We agree with the Government's premise; there can be no doubt that, were it not for the capture of these witnesses, Moussaoui could have no hope of obtaining their testimony. It does not follow, however, that this fortuity should not inure to Moussaoui's benefit. Indeed, the Government acknowledged that if the witnesses were brought to the United States for reasons unrelated to Moussaoui's prosecution, the district court would have the power to order their production. We are unable to discern why Moussaoui should be entitled to the benefit of the second windfall but not the first.

We also think that the Government's "windfall" argument mistakenly focuses on the ability of the district court to serve process on the *witnesses*, rather than on the custodian. The district court has never had—and does not now have—the power to serve process on the witnesses. But, as explained in Part III.B, the district court has always had the power to serve process on the custodian, [

]

*Henderson v. INS*, 157 F.3d 106, 122 (2d Cir. 1998); *cf. Rumsfeld v. Padilla*, 124 S. Ct. 2711, 2720 (2004) ("In challenges to present physical confinement, we reaffirm that the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent."). Here, however, the immediate custodian is unknown. Under such circumstances, the writ is properly served on the prisoner's ultimate custodian. *See Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986) (Bork, Circuit Judge, in chambers) (holding that a petitioner properly named the Attorney General as the respondent in his habeas petition because the identity of his immediate custodian was unknown); *see also Padilla*, 124 S. Ct. at 2726 n.18 (acknowledging that application of the immediate custodian rule was "impossible" in *Demjanjuk*). It would appear—at least the Government has not disputed—that the witnesses are in military custody. Therefore, Secretary of Defense Donald Rumsfeld is their ultimate custodian. Secretary Rumsfeld—who is indisputably within the process power of the district court—is thus a proper recipient of a testimonial writ directing production of the witnesses.[ ]

Even if it were necessary for the writ to be served upon the witnesses' immediate custodian, who is in a foreign country, the district court would have the power to serve the writ. In arguing otherwise, the Government points to the language of 28 U.S.C.A. § 2241(a) (West 1994)—which provides that district courts may issue writs of habeas corpus "within their respective jurisdictions"—and notes that in *Johnson v. Eisentrager*, 339 U.S. 763, 781-85 (1950), the Supreme Court held that the writ of habeas corpus *ad subjiciendum* ("the Great Writ") did not extend to enemy aliens held abroad. *But see Rasul v. Bush*, 124 S. Ct. 2686, 2693-95 (2004) (explaining that *Johnson* addressed only the question of "the prisoners' *constitutional* entitlement to habeas corpus" and noting that § 2241 makes habeas relief available as a matter of statutory law even when the Constitution does not require availability of the writ). Based upon the language of

[

]

§ 2241 and *Johnson*, the Government contends that the process power of the district court does not extend overseas.

This argument is premised on the assumption that territorial limitations applicable to the Great Writ also apply to the lesser writs. This assumption is incorrect. In *Carbo v. United States*, 364 U.S. 611 (1961), the Supreme Court considered the question of whether the writ of habeas corpus *ad prosequendum* ("prosecutorial writ") applied extraterritorially. The Court traced the different histories of the Great Writ and the testimonial and prosecutorial writs, noting that the statutory authority to issue the Great Writ had been territorially limited since at least 1875. *See id.* at 614-18. In contrast, the prosecutorial writ (authority for which derived from a different statutory provision) existed for the purpose of bringing a defendant into a jurisdiction for prosecution and thus was not traditionally territorially limited. *See id.* The Court concluded that while these distinctions were erased when Congress enacted § 2241, Congress did not intend to abandon them. *See Carbo*, 364 U.S. at 620. The Court therefore concluded that the prosecutorial writ may issue extraterritorially. *See id.* at 621.

Although the *Carbo* Court explicitly left the question open, its reasoning applies equally to the testimonial writ. *See Muhammad v. Warden*, 849 F.2d 107, 114 (4th Cir. 1988). It is thus clear that a district court can reach beyond the boundaries of its own district in order to issue a testimonial writ.

## IV.

The Government next argues that even if the district court would otherwise have the power to order the production of the witnesses, the January 30 and August 29 orders are improper because they infringe on the Executive's warmaking authority, in violation of separation of powers principles.[18]

---

[18]Moussaoui asserts that we should not consider this argument because any conflict between the Governments' interests and Moussaoui's is of the Government's making. There is no question that the Government cannot invoke national security concerns as a means of depriving Moussaoui of a fair trial. That is not what the Government is attempting to do,

A. *Immunity Cases*

We begin by examining the Government's reliance on cases concerning governmental refusal to grant immunity to potential defense witnesses. The Government argues that these cases stand for the proposition that the district court may be precluded from issuing certain orders that implicate the separation of powers. We reject this characterization of these cases.

"The Self-Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Withrow v. Williams*, 507 U.S. 680, 688 (1993) (quoting U.S. Const. amend. V). Nothing in the Fifth Amendment, or in any other constitutional provision provides a means for overcoming this privilege once a potential witness has invoked it. *See, e.g.*, *United States v. Lenz*, 616 F.2d 960, 962 (6th Cir. 1980). However, through the Immunity of Witnesses Act, 18 U.S.C.A. §§ 6001-6005 (West 2000 & Supp. 2003), Congress has conferred upon the Attorney General statutory authority to grant use immunity to witnesses in order to obtain their testimony at trial. *See generally Kastigar v. United States*, 406 U.S. 441, 446 (1972) (explaining that immunity statutes "seek a rational accommodation between the imperatives of the Fifth Amendment privilege and the legitimate demands of government to compel citizens to testify"). The Immunity Act grants the Attorney General or his designee exclusive authority and discretion to confer immunity. *See* 18 U.S.C.A. § 6003(b); *United States v. Washington*, 318 F.3d 845, 855 (8th Cir.), *cert. denied*, 124 S. Ct. 209, 251 (2003).

The circuit courts, including the Fourth Circuit, have uniformly held that district courts do not have any authority to grant immunity, even when a grant of immunity would allow a defendant to present material, favorable testimony. *See, e.g.*, *United States v. Bowling*, 239

---

however. The Government's claim is that separation of powers principles place the enemy combatant witnesses beyond the reach of the district court. If that is so (although we ultimately conclude it is not), then Moussaoui would not have an enforceable Sixth Amendment right to the witnesses' testimony.

F.3d 973, 976 (8th Cir. 2001); *United States v. Abbas*, 74 F.3d 506, 511-12 (4th Cir. 1996); *Lenz*, 616 F.2d at 962. These holdings have been based on the facts that no power to grant immunity is found in the Constitution and that Congress reserved the statutory immunity power to the Attorney General. *Cf. Earl v. United States*, 361 F.2d 531, 534 (D.C. Cir. 1966) (observing, in an opinion by then-Circuit Judge Warren Burger, that the power to grant immunity "is one of the highest forms of discretion conferred by Congress on the Executive" and cannot be assumed by the judiciary). Because a district court has no power to grant immunity to compel the testimony of a potential witness who has invoked the privilege against self-incrimination, a defendant has no Sixth Amendment right to such testimony. *See United States v. Turkish*, 623 F.2d 769, 773-74 (2d Cir. 1980) ("Traditionally, the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does no[t] carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination.").

The circuits are divided with respect to the question of whether a district court can ever compel the government, on pain of dismissal, to grant immunity to a potential defense witness. *Compare United States v. Mackey*, 117 F.3d 24, 27 (1st Cir. 1997) (stating that "in certain extreme cases of prosecutorial misconduct," government's refusal to grant immunity may justify dismissal of prosecution); *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991) (court may compel government to grant immunity to potential defense witness when "the fact-finding process is intentionally distorted by prosecutorial misconduct"); *Blissett v. Lefevre*, 924 F.2d 434, 441-42 (2d Cir. 1991) ("[A] trial court should order the prosecutor to grant a defense witness immunity only in extraordinary circumstances."), *and United States v. Frans*, 697 F.2d 188, 191 (7th Cir. 1983) ("[W]e have implied that review [of refusal to grant immunity] may be proper if there is a clear abuse of discretion violating the due process clause."), *with Bowling*, 239 F.3d at 976-77 (holding that district court has no authority to compel government to grant immunity); *cf. United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999) (noting that the Sixth Circuit has not yet decided whether, and under what circumstances, a district court could compel the government to grant immunity to a potential witness); *Autry v. Estelle*, 706 F.2d 1394, 1401 (5th Cir.

1983) (leaving open possibility that compelled grant of immunity may be justified by prosecutorial misconduct). The Fourth Circuit, consistent with the majority rule, has held that a district court may compel the government to grant immunity upon a showing of prosecutorial misconduct and materiality. *See Abbas*, 74 F.3d at 512.

Courts have noted that compelling the prosecution to grant immunity implicates the separation of powers.[19] *See, e.g., Turkish*, 623 F.2d at 775-76. Decisions to grant or deny immunity are intimately tied to decisions regarding which perpetrators of crimes will be prosecuted, a core aspect of the Executive's duty to enforce the laws. *See United States v. Pennell*, 737 F.2d 521, 528 (6th Cir. 1984). On a related note, a grant of immunity creates substantial burdens on the Executive's ability to prosecute the witness. Prosecuting a previously immunized witness requires the government to bear the "heavy burden" of proving that the prosecution does not rest on immunized testimony. *Turkish*, 623 F.2d at 775 (internal quotation marks omitted). Further, "awareness of the obstacles to successful prosecution of an immunized witness may force the prosecution to curtail its cross-examination of the witness in the case on trial to narrow the scope of the testimony that the witness will later claim tainted his subsequent prosecution." *Id.*

The Government claims that these "immunity cases" stand for the proposition that, under certain circumstances, legitimate separation of powers concerns effectively insulate the Government from being compelled to produce evidence or witnesses. In fact, the majority rule and the law of this circuit stand for precisely the opposite proposition, namely, that courts *will* compel a grant of immunity, *despite the existence of separation of powers concerns*, when the defendant demonstrates that the Government's refusal to grant immunity to an essential defense witness constitutes an abuse of the discretion granted to the Government by the Immunity Act. A showing of misconduct is necessary because, as explained above, a defendant has no Sixth Amendment right to the testimony of a potential witness who has invoked the Fifth Amendment right against self-incrimination; therefore, the

---

[19]There is also a concern that the opportunity to compel the government to grant immunity may induce "cooperative perjury among law violators." *Turkish*, 623 F.2d at 775.

defendant has no Sixth Amendment right that could outweigh the Government's interest in using its immunity power sparingly. Governmental abuse of the immunity power, however, vitiates this interest because when the Government's misconduct threatens to impair the defendant's right to a fair trial, it is proper for the district court to protect that right by compelling the Government to immunize the witness.

For these reasons, the analogy between this case and the immunity cases is inapt. The witnesses at issue here, unlike potential witnesses who have invoked their Fifth Amendment rights, are within the process power of the district court, and Moussaoui therefore has a Sixth Amendment right to their testimony. As discussed below, this right must be balanced against the Government's legitimate interest in preventing disruption [

            ] of the enemy combatant witnesses.

## B. *Governing Principles*

The concept that the various forms of governmental power—legislative, executive, and judicial—should be exercised by different bodies predates the Constitution. *See Loving v. United States*, 517 U.S. 748, 756 (1996) (citing Montesquieu, *The Spirit of the Laws* 151-52 (Thomas Nugent trans., 1949), and 1 William Blackstone, *Commentaries* *146-*147, *269-*270). The alternative, "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, . . . may justly be pronounced the very definition of tyranny." *The Federalist* No. 47, at 244 (James Madison) (Gary Wills ed., 1982). "The principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Buckley v. Valeo*, 424 U.S. 1, 124 (1976) (per curiam); *see INS v. Chadha*, 462 U.S. 919, 946 (1983) ("The very structure of the Articles delegating and separating powers under Arts. I, II, and III exemplifies the concept of separation of powers . . . ."). And, the Supreme Court "consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989).

Separation of powers does not mean, however, that each branch is prohibited from *any* activity that might have an impact on another. *See The Federalist* No. 47, at 245 (James Madison) (explaining that separation of powers does not mean that the branches "ought to have no partial agency in, or no controul over the acts of each other," but rather means "that where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution, are subverted" (emphasis omitted)). "[A] hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Buckley*, 424 U.S. at 121. Indeed, the Supreme Court has observed that "even quite burdensome interactions" between the judiciary and the Executive do not "necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997). One example of permissible but burdensome interaction is judicial review of official Executive conduct. *See id.* at 703.

Stated in its simplest terms, the separation of powers doctrine prohibits each branch of the government from "intrud[ing] upon the central prerogatives of another." *Loving*, 517 U.S. at 757. Such an intrusion occurs when one branch arrogates to itself powers constitutionally assigned to another branch or when the otherwise legitimate actions of one branch impair the functions of another. *See id.*; *see Clinton*, 520 U.S. at 701-02.

This is not a case involving arrogation of the powers or duties of another branch. The district court orders requiring production of the enemy combatant witnesses involved the resolution of questions properly—indeed, exclusively—reserved to the judiciary. Therefore, if there is a separation of powers problem at all, it arises only from the burden the actions of the district court place on the Executive's performance of its duties. *See Clinton*, 520 U.S. at 701-06 (addressing claim that separation of powers principles barred "an otherwise traditional exercise of judicial power" that would "impose an unacceptable burden on the President's time and energy, and thereby impair the effective performance of his office").

The Supreme Court has explained on several occasions that determining whether a judicial act places impermissible burdens on

another branch of government requires balancing the competing interests. *See, e.g.*, *Nixon v. Admin'r of Gen. Servs.*, 433 U.S. 425, 443 (1977). In a case concerning the extent of the President's executive immunity, the Supreme Court noted that "[c]ourts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint." *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982). The Court continued,

> It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States. But our cases also have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch.

*Id*. at 753-54 (citations & footnote omitted).

## C. *Balancing*

### 1. *The Burden on the Government*

The Constitution charges the Congress and the Executive with the making and conduct of war. U.S. Const. art. I, § 8, cl. 11-16 (setting forth Congress' war powers); *id*. art. II., § 2, cl. 1 (providing that "[t]he President shall be Commander in Chief of the Army and Navy of the United States"); *Hamdi v. Rumsfeld* (*Hamdi II*), 296 F.3d 278, 281 (4th Cir. 2002). It is not an exaggeration to state that the effective performance of these duties is essential to our continued existence as a sovereign nation. Indeed, "no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see Hamdi II*, 296 F.3d at 283 (observing, in the post- September 11 context, that "government has no more profound responsibility than the protection of Americans . . . against additional unprovoked attack"). Thus, "[i]n accordance with [the] constitutional text, the Supreme Court has shown great deference to the political branches when called upon to decide cases implicating sensitive matters of foreign policy, national security, or military affairs." *Hamdi II*, 296 F.3d at 281.

The Government alleges—and we accept as true—that [              ] the enemy combatant witnesses is critical to the ongoing effort to combat terrorism by al Qaeda. The witnesses are [        ] al Qaeda operatives who have extensive knowledge concerning not just the September 11 attacks, but also other past attacks, future operations, and the structure, personnel, and tactics of al Qaeda. Their value as intelligence sources can hardly be overstated. And, we must defer to the Government's assertion that interruption [        ] of these witnesses will have devastating effects on the ability to gather information from them. *Cf. CIA v. Sims*, 471 U.S. 159, 176 (1985) (noting that "whether an intelligence source will be harmed if his identity is revealed will often require complex political, historical, and, psychological judgments" that courts are poorly equipped to make). [                                              ] it is not unreasonable to suppose that interruption [        ] could result in the loss of information that might prevent future terrorist attacks.

The Government also asserts that production of the witnesses would burden the Executive's ability to conduct foreign relations. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) ("In this vast external realm, . . . the President alone has the power to speak or listen as a representative of the nation."). The Government claims that if the Executive's assurances of confidentiality can be abrogated by the judiciary, the vital ability to obtain the cooperation of other governments will be devastated.

The Government also reminds us of the bolstering effect production of the witnesses might have on our enemies. In *Johnson*, the Supreme Court considered the question of whether enemy aliens, captured and detained abroad, should be able to assert Fifth Amendment claims by means of a petition for the Great Writ. *See Johnson*, 339 U.S. at 767. In rejecting this claim, the Court noted that issuance of the writ to enemy aliens would not only impose direct burdens on military commanders, but would also bolster the enemy in a manner inimical to the war effort:

> A basic consideration in *habeas corpus* practice is that the prisoner will be produced before the court. . . . To grant the writ to these prisoners might mean that our army must transport them across the seas for hearing. This would require

allocation of shipping space, guarding personnel, billeting
and rations. . . . The writ, since it is held to be a matter of
right, would be equally available to enemies during active
hostilities as in the present twilight between war and peace.
Such trials would hamper the war effort and bring aid and
comfort to the enemy. They would diminish the prestige of
our commanders, not only with enemies but with wavering
neutrals. It would be difficult to devise more effective fetter-
ing of a field commander than to allow the very enemies he
is ordered to reduce to submission to call him to account in
his own civil courts and divert his efforts and attention from
the military offensive abroad to the legal defensive at home.
Nor is it unlikely that the result of such enemy litigiousness
would be a conflict between judicial and military opinion
highly comforting to enemies of the United States.

*Id*. at 778-79. Although the concerns expressed in *Johnson* do not
exactly translate to the present context, the Government asserts that
they are nevertheless relevant.[

]

In summary, the burdens that would arise from production of the
enemy combatant witnesses are substantial.

### 2. *Moussaoui's Interest*

The importance of the Sixth Amendment right to compulsory pro-
cess is not subject to question—it is integral to our adversarial crimi-
nal justice system:

The need to develop all relevant facts in the adversary sys-
tem is both fundamental and comprehensive. The ends of
criminal justice would be defeated if judgments were to be
founded on a partial or speculative presentation of the facts.
The very integrity of the judicial system and public confi-
dence in the system depend on full disclosure of all the
facts, within the framework of the rules of evidence. To
ensure that justice is done, it is imperative to the function of

the courts that compulsory process be available for the pro-
duction of evidence needed either by the prosecution or by
the defense.

*United States v. Nixon*, 418 U.S. 683, 709 (1974); *see Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense."). To state the matter more succinctly, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The compulsory process right does not attach to any witness the defendant wishes to call, however. Rather, a defendant must demonstrate that the witness he desires to have produced would testify "in his favor." U.S. Const. amend. VI; *see United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Thus, in order to assess Moussaoui's interest, we must determine whether the enemy combatant witnesses could provide testimony material to Moussaoui's defense.

In the CIPA context,[20] we have adopted the standard articulated by the Supreme Court in *Roviaro v. United States*, 353 U.S. 53 (1957), for determining whether the government's privilege in classified information must give way. *See United States v. Smith*, 780 F.2d 1102, 1107-10 (4th Cir. 1985) (en banc). Under that standard, a defendant becomes entitled to disclosure of classified information upon a showing that the information "'is relevant and helpful to the defense . . . or is essential to a fair determination of a cause.'" *Id.* at 1107 (quoting *Roviaro*, 353 U.S. at 60-61); *see United States v. Fer-*

---

[20]We adhere to our prior ruling that CIPA does not apply because the January 30 and August 29 orders of the district court are not covered by either of the potentially relevant provisions of CIPA: § 4 (concerning deletion of classified information from *documents* to be turned over to the defendant during discovery) or § 6 (concerning the disclosure of classified information by the defense during pretrial or trial proceedings). *See Moussaoui I*, 333 F.3d at 514-15. Like the district court, however, we believe that CIPA provides a useful framework for considering the questions raised by Moussaoui's request for access to the enemy combatant witnesses.

*nandez*, 913 F.2d 148, 154 (4th Cir. 1990) (explaining that "*Smith* requires the admission of classified information" once the defendant has satisfied the *Roviaro* standard).

Because Moussaoui has not had—and will not receive—direct access to any of the witnesses, he cannot be required to show materiality with the degree of specificity that applies in the ordinary case. *See Valenzuela-Bernal*, 458 U.S. at 870-71, 873. Rather, it is sufficient if Moussaoui can make a "plausible showing" of materiality. *Id.* at 873; *cf. id.* at 871 (noting that a defendant who has not interviewed a potential witness may demonstrate materiality by relating "the events to which a witness might testify [ ] and the relevance of those events to the crime charged"). However, in determining whether Moussaoui has made a plausible showing, we must bear in mind that Moussaoui *does* have access to the [          ] summaries. *See* Part V.B, *infra*.

Before considering whether Moussaoui has made the necessary showing with respect to each witness, we pause to consider some general arguments raised by the Government concerning materiality. First, the Government maintains that Moussaoui can demonstrate materiality only by relying on admissible evidence. We agree with the Government to a certain extent—Moussaoui should not be allowed to rely on obviously inadmissible statements (*e.g.*, statements resting on a witness' belief rather than his personal knowledge). *Cf. Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963)). However, because many rulings on admissibility—particularly those relating to relevance—can only be decided in the context of a trial, most of the witnesses' statements cannot meaningfully be assessed for admissibility at this time. Moreover, statements that may not be admissible at the guilt phase may be admissible during the penalty phase, with its more relaxed evidentiary standards. *See* 18 U.S.C.A. § 3593(c) (West Supp. 2003).

Second, the Government maintains that Moussaoui cannot establish materiality unless he can prove that the witnesses would not invoke their Fifth Amendment rights against self-incrimination. We previously indicated, however, that a court should not assume that a

potential witness will invoke the Fifth Amendment. *Cf. United States v. Walton*, 602 F.2d 1176, 1180 (4th Cir. 1979) (noting that, when a potential defense witness is in protective custody, "the better procedure is to allow the defense counsel to hear directly from the witness whether he would be willing to talk to the defense attorney"). While circumstances indicating that a potential witness will refuse to testify may support a decision not to compel disclosures sought by the defense, *see United States v. Polowichak*, 783 F.2d 410, 414 (4th Cir. 1986), such circumstances are not present here. While it is possible that the witnesses would be reluctant to testify in a deposition setting, there is no particular reason to assume that they would refuse. *Cf. Watkins v. Callahan*, 724 F.2d 1038, 1044 (1st Cir. 1984) (noting that a potential defense witness who was charged with the same murder as the defendant, and who was resisting extradition, "in all likelihood would refuse to testify").

Additionally, the Government argues that even if the witnesses' testimony would tend to exonerate Moussaoui of involvement in the September 11 attacks, such testimony would not be material because the conspiracies with which Moussaoui is charged are broader than September 11. Thus, the Government argues, Moussaoui can be convicted even if he lacked any prior knowledge of September 11. This argument ignores the principle that the scope of an alleged conspiracy is a jury question, *see United States v. Sharpe*, 193 F.3d 852, 867 (5th Cir. 1999), and the possibility that Moussaoui may assert that the conspiracy culminating in the September 11 attacks was distinct from any conspiracy in which he was involved. Moreover, even if the jury accepts the Government's claims regarding the scope of the charged conspiracy, testimony regarding Moussaoui's non-involvement in September 11 is critical to the penalty phase. If Moussaoui had no involvement in or knowledge of September 11, it is entirely possible that he would not be found eligible for the death penalty.[21]

---

[21]For example, the Government maintains that even if Moussaoui was not part of the September 11 attacks, he may be subject to the death penalty for withholding information regarding the upcoming attacks after his arrest. *See* 18 U.S.C.A. § 3591(a)(2)(C) (West 2000) (providing that a defendant is eligible for the death penalty if the jury finds, beyond a reasonable doubt, that the defendant "intentionally participated in an act, contemplating that the life of a person would be taken . . . , and the vic-

We now consider the rulings of the district court regarding the ability of each witness to provide material testimony in Moussaoui's favor.

### a. *Witness A*

The district court did not err in concluding that Witness A could offer material evidence on Moussaoui's behalf.[22] [

]Several statements by Witness A tend to exculpate Moussaoui.[

]to undermine the theory (which the Government may or may not intend to advance at trial) that Moussaoui was to pilot a fifth plane into the White House. [

] This statement is significant in light of other evidence [

---

tim died as a direct result of the act"); Br. for the United States at 89 (asserting that Moussaoui "lied in a way that concealed the conspiracy and prevented discovery of the September 11 attacks"). A finding by the jury that Moussaoui lacked any knowledge of the planned September 11 attacks would substantially undermine this theory, although the Government might still be able to establish Moussaoui's eligibility for the death penalty based on his failure to disclose whatever knowledge he did have.

[22]The parties dispute whether the materiality determinations by the district court are reviewed de novo or for abuse of discretion. We do not decide this question because we would affirm the district court under either standard.

[           ] This is consistent with Moussaoui's claim that he was to be part of a post-September 11 operation.

The Government argues that Witness A's statements are actually incriminatory of Moussaoui.[23] It is true that Witness A has made some statements that arguably implicate Moussaoui in the September 11 attacks. [


[           ] On balance, however, Moussaoui has made a sufficient showing that evidence from Witness A would be more helpful than hurtful, or at least that we cannot have confidence in the outcome of the trial without Witness A's evidence.

### b. *Witness B*

There can be no question that Witness B could provide material evidence on behalf of Moussaoui. [

---

[23]The Government points to several statements relating Witness A's belief that Moussaoui was involved in the September 11 attacks. However, a witness' "belief" is not admissible evidence. *See United States v. Tanner*, 941 F.2d 574, 585 (7th Cir. 1991) (noting that witnesses cannot testify to events of which they do not have personal knowledge).

          ] Witness B [        ] has indicated that Moussaoui's operational knowledge was limited, a fact that is clearly of exculpatory value as to both guilt and penalty. [

          ] Thus, of all three witnesses, Witness B is of the greatest exculpatory value.

c. *Witness C*

   [

                                                                              ]

The district court determined that Witness C could provide material evidence because he could support Moussaoui's contention that he was not involved in the September 11 attacks. We agree with the district court that a jury might reasonably infer, from Witness C [

            ] that Moussaoui was not involved in September 11. We therefore conclude that Moussaoui has made a plausible showing that Witness C would, if available, be a favorable witness.

### 3. *Balancing*

Having considered the burden alleged by the Government and the right claimed by Moussaoui, we now turn to the question of whether the district court should have refrained from acting in light of the national security interests asserted by the Government. The question is not unique; the Supreme Court has addressed similar matters on numerous occasions. In all cases of this type—cases falling into "what might loosely be called the area of constitutionally guaranteed access to evidence," *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988) (internal quotation marks omitted)—the Supreme Court has held that the defendant's right to a trial that comports with the Fifth and Sixth Amendments prevails over the governmental privilege. Ultimately, as these cases make clear, the appropriate procedure is for the district court to order production of the evidence or witness and leave to the Government the choice of whether to comply with that order. If the government refuses to produce the information at issue—as it may properly do—the result is ordinarily dismissal.[24]

For example, in *Roviaro*, the Supreme Court considered the conflict between the governmental interest in protecting the identity of a confidential informant and a defendant's right to present his case. The Court acknowledged the importance of the so-called informer's privilege but held that this privilege is limited by "the fundamental requirement of fairness. Where the disclosure of an informer's iden-

---

[24]Some of the cases in this "area" involve a defendant's Sixth Amendment rights, while others concern a defendant's rights under the Due Process Clause. The fact that different constitutional provisions are involved is immaterial to our analysis. *See, e.g., Pennsylvania v. Ritahis*, 480 U.S. 39, 56 (1987) (adopting due process framework for analyzing compulsory process claim).

tity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60-61. The Court emphasized that the choice to comply with an order to disclose the identity of a confidential informant belongs to the Government. *See id.* at 59 ("What is usually referred to as the informer's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law," (emphasis added)); *id.* at 61 (stating that when the identity of a confidential informant is necessary to the defense, "the trial court may require disclosure and, *if the Government withholds the information* dismiss the action" (emphasis added)).

That it is the responsibility of the Government to decide whether it will comply with a discovery order is even more apparent from *Jencks v. United States*, 353 U.S. 657 (1957), in which the Court held that the government's privilege in confidential reports generated by prosecution witnesses must give way to the defendant's right to effectively cross-examine the witnesses, *see id.* at 668-69. The Court acknowledged that "the protection of vital national interests may militate against public disclosure of documents in the Government's possession" but concluded that

> the Government can invoke its evidentiary privileges only at the price of letting the defendant go free. . . . [S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

*Id.* at 670-71 (internal quotation marks omitted). The Supreme Court emphatically stated that "[t]he burden is the Government's, *not to be shifted to the trial judge*, to decide whether the public prejudice of allowing the crime to go unpunished is greater than that attendant upon the possible disclosure of state secrets and other confidential information in the Government's possession." *Id.* at 672 (emphasis added).

The Supreme Court has also applied this rule—-that a governmental refusal to produce evidence material to the defense is made upon

pain of sanction—to the good faith deportation of potential defense witnesses. In *Valenzuela-Bernal*, the defendant claimed that the Government violated his compulsory process rights by deporting two illegal immigrants who were potential defense witnesses. In assessing this claim, the Court observed that the case involved a conflict between the "vitally important" Executive duty of prosecuting criminal offenders and the congressional mandate (to be carried out by the Executive) of promptly deporting illegal aliens. *Valenzuela-Bernal*, 458 U.S. at 863-64. The Court admonished that:

> it simply will not do . . . to minimize the Government's dilemma in cases like this. Congress' immigration policy and the practical considerations discussed above [regarding overcrowding in detention facilities] demonstrate that the Government had good reason to deport [the potential witnesses] once it concluded that they possessed no evidence relevant to the prosecution or the defense of [the] criminal charge. No onus, in the sense of "hiding out" or "concealing" witnesses, attached to the Government by reason of its discharge of the obligations imposed upon it by Congress; its exercise of these manifold responsibilities is not to be judged by standards which might be appropriate if the Government's only responsibility were to prosecute criminal offenses.

*Id.* at 865-66. The Court nevertheless held that the Government's good faith deportation of the potential witnesses would be sanctionable if the witnesses were material to the defense. *See id.* at 873-74.

In addition to the pronouncements of the Supreme Court in this area, we are also mindful of Congress' judgment, expressed in CIPA, that the Executive's interest in protecting classified information does not overcome a defendant's right to present his case. Under CIPA, once the district court determines that an item of classified information is relevant and material, that item must be admitted unless the government provides an adequate substitution. *See* 18 U.S.C.A. App. 3 § 6(c)(1); *Fernandez*, 913 F.2d at 154. If no adequate substitution can be found, the government must decide whether it will prohibit the disclosure of the classified information; if it does so, the district court

must impose a sanction, which is presumptively dismissal of the indictment. *See* 18 U.S.C.A. App. 3 § 6(e).

In view of these authorities, it is clear that when an evidentiary privilege—even one that involves national security—is asserted by the Government in the context of its prosecution of a criminal offense, the "balancing" we must conduct is primarily, if not solely, an examination of whether the district court correctly determined that the information the Government seeks to withhold is material to the defense. We have determined that the enemy combatant witnesses can offer material testimony that is essential to Moussaoui's defense, and we therefore affirm the January 30 and August 29 orders. Thus, the choice is the Government's whether to comply with those orders or suffer a sanction.

**Volume 2 of 2**

V.

As noted previously, the Government has stated that it will not produce the enemy combatant witnesses for depositions (or, we presume, for any other purpose related to this litigation). We are thus left in the following situation: the district court has the power to order production of the enemy combatant witnesses and has properly determined that they could offer material testimony on Moussaoui's behalf, but the Government has refused to produce the witnesses. Under such circumstances, dismissal of the indictment is the usual course. *See, e.g., Jencks*, 353 U.S. at 672; *Roviaro*, 353 U.S. at 61. Like the district court, however, we believe that a more measured approach is required.[25] Additionally, we emphasize that no punitive sanction is warranted here because the Government has rightfully exercised its prerogative to protect national security interests by refusing to produce the witnesses.[26]

Although, as explained above, this is not a CIPA case, that act nevertheless provides useful guidance in determining the nature of the remedies that may be available. Under CIPA, dismissal of an indictment is authorized only if the government has failed to produce an

---

[25]The Government asserts that we need not provide any remedy for the denial of access to the witnesses because Moussaoui may have a due process right to the admission of hearsay evidence containing statements made by the witnesses. *See Chambers*, 410 U.S. at 302-03. The possible existence of such a right—which the Government indicated at oral argument that it would contest—does not excuse us from remedying the violation of Moussaoui's Sixth Amendment rights.

[26]We emphasize that by all appearances, the Government's refusal to produce the witnesses is done in the utmost good faith. The Government is charged not only with the task of bringing wrongdoers to justice, but also with the grave responsibility of protecting the lives of the citizenry. The choice the Government has made is not without consequences, but those consequences are not punitive in nature.

adequate substitute for the classified information, *see* U.S.C.A. App. 3 § 6(c)(1), and the interests of justice would not be served by imposition of a lesser sanction, *see id.* § 6(e)(2). CIPA thus enjoins district courts to seek a solution that neither disadvantages the defendant nor penalizes the government (and the public) for protecting classified information that may be vital to national security.

A similar approach is appropriate here. Under such an approach, the first question is whether there is any appropriate substitution for the witnesses' testimony. Because we conclude, for the reasons set forth below, that appropriate substitutions are available, we need not consider any other remedy.

## A.  *Standard*

CIPA provides that the government may avoid the disclosure of classified information by proposing a substitute for the information, which the district court must accept if it "will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." *Id.* § 6(c)(l); *see United States v. Rezaq*, 134 F.3d 1121, 1143 (D.C. Cir. 1998) (concluding that proposed substitutions for classified documents were acceptable because "[n]o information was omitted from the substitutions that might have been helpful to [the] defense, and the discoverable documents had no unclassified features that might have been disclosed to [the defendant]"). We believe that the standard set forth in CIPA adequately conveys the fundamental purpose of a substitution: to place the defendant, as nearly as possible, in the position he would be in if the classified information (here, the depositions of the witnesses) were available to him. *See* H. R. Conf. Rep. No. 96-1436, at 12-13 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4307, 4310-11 (explaining that "precise, concrete equivalence is not intended. The fact that insignificant tactical advantages could accrue to the defendant by use of the specific classified information should not preclude the court from ordering alternative disclosure.") *cf. Fernandez*, 913 F.2d at 158 (affirming rejection of proposed substitutions that "fell far short of informing the jury about that which the trial judge had already determined to be essential to [the] defense"). Thus, a substitution is an appropriate remedy when it will not materially disadvantage the defendant. *Cf. Ball v. Woods*, 402 F. Supp. 803, 810 (M.D. Ala. 1975)

("Access—or due process—is ultimately a matter of providing an opportunity to have one's claim resolved in a meaningful manner, and does not guarantee that such claim will be presented in the most effective manner.")

## B. *Substitutions proposed by the Government*

The Government proposed substitutions for the witnesses' deposition testimony in the form of a series of statements derived from the [          ] summaries.[27] The district court rejected all proposed substitutions as inadequate.[28] The ruling of the district court was based on its conclusions regarding the inherent inadequacy of the substitutions and its findings regarding the specific failings of the Government's proposals. For the reasons set forth below, we reject the ruling of the district court that any substitution for the witnesses' testimony would be inadequate. We agree, however, with the assessment that the particular proposals submitted by the Government are inadequate in their current form.

First, the district court deemed the substitutions inherently inadequate because the [          ] reports, from which the substitutions were ultimately derived, were unreliable.[29] This was so, the court rea-

---

[27]In the case of Witness A, the proposed substitutions were submitted in narrative form rather than as excerpts from the [          ] summaries. The substitutions for Witnesses B and C more closely tracked the language of the [          ] summaries.

[28]The court filed a memorandum opinion discussing in detail its reasons for rejecting the proposed substitutions for Witness A's deposition testimony. The rejection of the Government's proposed substitutions for the deposition testimony of Witnesses B and C was accomplished by a brief order finding the substitutions inadequate for the reasons stated in its order concerning the proposed substitutions for Witness A's deposition testimony.

[29]The court also deemed the substitutions inadequate because the use of substitutions would deprive Moussaoui of the ability to question witnesses regarding matters that do not appear [          ] in the reports. In essence, the district court appears to have concluded that the substitutions are inadequate because they are not the same thing as a deposition. However, we have already determined that a proposed substitution need not provide Moussaoui with all the benefits of a deposition in order to be adequate.

soned, because the witnesses' [
                                    ] Supp. J.A.C. (03-4162) 271,
[
                                    ] The district court also com-
plained that it cannot be determined whether the [          ] reports
accurately reflect the witnesses' statements [
                                    ][30] The court further commented
that the lack of quotation marks in the [          ] reports made it
impossible to determine whether a given statement is a verbatim
recording or [

        ] *Id.* at 273.


   The conclusion of the district court that the proposed substitutions
are inherently inadequate is tantamount to a declaration that there
could be no adequate substitution for the witnesses' deposition testi-
mony. We reject this conclusion. The answer to the concerns of the
district court regarding the accuracy of the [          ] reports is that
those who are [          ] the witnesses have a profound interest in
obtaining accurate information from the witnesses and in reporting
that information accurately to those who can use it to prevent acts of
terrorism and to capture other al Qaeda operatives. These consider-
ations provide sufficient indicia of reliability to alleviate the concerns
of the district court.

   Next, the district court noted that the substitutions do not indicate
that they are summaries of statements made over the course of several
months. We agree with the district court that in order to adequately
protect Moussaoui's right to a fair trial, the jury must be made aware
of certain information concerning the substitutions. The particular
content of any instruction to the jury regarding the substitutions lies
within the discretion of the district court. *See United States v. Wills*,
346 F.3d 476, 492 (4th Cir. 2003), *cert. denied*, 124 S. Ct. 2906
(2004). However, at the very least the jury should be informed that

---

[30]The district court did not complain that the [          ] summaries do
not accurately summarize the [          ] reports. At the hearing con-
cerning the Government's proposed substitutions for Witness A's testi-
mony, the court commented that it had been "impressed with the
accuracy" of the [          ] summaries. Supp. J.A.C. (03-4162) 175.

the substitutions are derived from reports [        ] of the witnesses. The instructions must account for the fact that members of the prosecution team have provided information and suggested [                          ] The jury should also be instructed that the statements were obtained under circumstances that support a conclusion that the statements are reliable.[31]

We reject the suggestion of the district court that the Government acted improperly in attempting to organize the information presented in the substitutions. Counsel rarely, if ever, present information to the jury in the order they received it during pretrial investigations. Indeed, organizing and distilling voluminous information for comprehensible presentation to a jury is a hallmark of effective advocacy. In short, while there may be problems with the *manner* in which the Government organized the substitutions, the fact that the Government has attempted such organization is not a mark against it.

The district court identified particular problems with the proposed substitutions for Witness A's testimony. For example, the court noted that the proposed substitutions failed to include exculpatory information provided by Witness A and incorporated at least one incriminatory inference not supplied by Witness A's statements.[1] Our own

---

[31]Nothing in the Government's submission in connection with the Petition contradicts our conclusion that those [        ] the witnesses have a profound interest in obtaining truthful information. To the contrary, we are even more persuaded that the [        ] process is carefully designed to elicit truthful and accurate information from the witnesses.

We emphasize that we have never held, nor do we now hold, that the witnesses' statements are *in fact* truthful, and the jury should not be so instructed. Instead, the jury should be informed that the circumstances were designed to elicit truthful statements from the witnesses. We offer no opinion regarding whether this instruction may include information regarding [                          ]

[

review of the proposed substitutions for the testimony of Witnesses B and C reveals similar problems.[1] These problems, however, may be remedied as described below.

## C.  *Instructions for the District Court*

### 1.  *Submission of Questions by Moussaoui*

The Government's submissions in response to the Petition make clear that members of the prosecution team, [

] have had some input [                         ] the enemy combatant witnesses. Our review of the circumstances of this access indicates that the input by the prosecution team into the [       ] process has worked no unfairness on Moussaoui. Nevertheless, in order to provide Moussaoui with the fullest possible range of information from the witnesses, we direct the district court to provide Moussaoui with an

]

[

]

opportunity to [                    ] for [        ] discretionary use [           ] of the witnesses.[34]

### 2. *Substitutions*

For the reasons set forth above, we conclude that the district court, erred in ruling that any substitution for the witnesses' testimony is inherently inadequate to the extent it is derived from the [          ] reports. To the contrary, we hold that the [         ] summaries (which, as the district court determined, accurately recapitulate the [         ] reports) provide an adequate basis for the creation of written statements that may be submitted to the jury in lieu of the witnesses' deposition testimony.

The compiling of substitutions is a task best suited to the district court, given its greater familiarity with the facts of the case and its authority to manage the presentation of evidence.[35] Nevertheless, we think it is appropriate to provide some guidance to the court and the parties.

First, the circumstances of this case—most notably, the fact that the substitutions may very well support Moussaoui's defense—dictate

---

[34]During the hearing regarding the Petition, defense counsel expressed concern over whether [       ] would result in the disclosure of trial strategy to the Government. The Government, in its June 16 filing, informs us that measures can be taken to avoid such disclosures. We leave the particulars of any such process to the discretion of the district court. *See United States v. Jones*, 136 F.3d 342, 349 (4th Cir. 1998) (noting that discovery matters are left to the discretion of the district court). At an absolute minimum, however, whatever process is adopted must ensure that the prosecution team is not privy to [          ] propounded by the defense, just as the defense was unaware of [          ] propounded by the prosecution team.

[35]We note that the district court will not be drafting original language for submission to the jury. Instead, as we discuss further in the text, Moussaoui will designate portions of the [          ] summaries for submission; the Government will raise objections and cross-designate portions of the summaries it believes are required by the rule of completeness; and the district court will make rulings as necessary to compile an appropriate set of substitutions.

that the compiling of substitutions be an interactive process among the parties and the district court.[36] Second, we think that accuracy and fairness are best achieved by compiling substitutions that use the exact language of the [          ] summaries to the greatest extent possible. We believe that the best means of achieving both of these objectives is for defense counsel to identify particular portions of the [          ] summaries that Moussaoui may want to admit into evidence at trial. The Government may then offer any objections and argue that additional portions must be included in the interest of completeness, as discussed below. If the substitutions are to be admitted at all (we leave open the possibility that Moussaoui may decide not to use the substitutions in his defense), they may be admitted only by Moussaoui. Based on defense counsel's submissions and the Government's objections, the district court could then compile an appropriate set of substitutions.[37] We leave to the discretion of the district court the question of whether to rule on the admissibility of a particular substitution (*e.g.*, whether a substitution is relevant) at trial or during pre-trial proceedings.

---

[36]We disagree with Judge Gregory's view that, by assigning the district court a role in compiling the substitutions, we have "place[d] the district court in the position of being an advocate in the proceedings," post, at 59, and that "we are setting ourselves out as super-arbiters of the admission of evidence in this case," *id.* at 59 n.4. In fact, what we are asking the district court to do is little removed from the quite ordinary judicial task of assessing the admissibility of evidence. And, any subsequent review by this court on these matters will involve nothing more than review of evidentiary rulings—a routine function of an appellate court.

We also disagree with Judge Gregory's suggestion that we are somehow contravening CIPA by mandating that the district court be involved in compiling substitutions. CIPA authorizes the Government to move for an order approving substitutions for classified information, *see* 18 U.S.C.A. App. 3 § 6(c)(1), but it does not mandate that the Government draft proposed substitutions. Thus, although it is likely that the Government will draft substitutions in the vast majority of CIPA cases, nothing in CIPA expressly or implicitly precludes the involvement of defense counsel or the district court.

[37]We leave it to the district court to determine whether national security mandates non-substantive changes, such as alternate names for people or places, in order to accommodate national security concerns articulated by the Government when the substitutions are being compiled.

As previously indicated, the jury must be provided with certain information regarding the substitutions. While we leave the particulars of the instructions to the district court, the jury must be informed, at a minimum, that the substitutions are what the witnesses would say if called to testify; that the substitutions are derived from statements obtained under conditions that provide circumstantial guarantees of reliability; that the substitutions contain statements obtained over the course of weeks or months; that members of the prosecution team have contributed to [          ] the witnesses; and, if applicable, that Moussaoui has [          ] to the witnesses.[38]

### a. *Rule of Completeness*

Moussaoui asserts that allowing the Government to argue that additional portions of the summaries must be included in the substitutions will result in substitutions "larded with inculpatory information under the guise of 'completeness,'" Petition at 12, in violation of the Confrontation Clause, *see Crawford v. Washington*, 124 S. Ct. 1354, 1374 (2004). And, indeed, the Government has indicated its view that the rule of completeness would allow it to designate an inculpatory portion of a witness' statement to counter an exculpatory statement by the same witness designated by Moussaoui.[39] *See* Hrg. Tr. (June 3, 2004) at 59-60; *see also* Response at 35 (asserting that rule of completeness requires introduction of "witness statements in their full context").

The common law "rule of' completeness" is partially codified in Federal Rule of Evidence 106, which provides, "When a writing or recorded statement or part thereof is introduced by a party, an adverse

---

[38]We are mindful of the fact that no written substitution will enable the jury to consider the witnesses' demeanor in determining their credibility. *See Fieldcrest Cannon, Inc. v. NLRB*, 97 F.3d 65, 71 (4th Cir. 1996) (noting that demeanor is a factor in determining credibility). We believe that the instructions outlined above, plus any other instructions the district court may deem necessary in the exercise of its discretion, adequately address this problem.

[39]The Government acknowledges that, under the circumstances here, the rule of completeness would not allow it to use a statement by one witness to "complete" a statement by another.

party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The purpose of Rule 106 is "to prevent a party from misleading the jury by allowing into the record relevant portions of [a writing or recorded statement] which clarify or explain the part already received." *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996). "The rule is protective, merely. It goes only so far as is necessary to shield a party from adverse inferences, and only allows an explanation or rebuttal of the evidence received." *United States v. Corrigan*, 168 F.2d 641, 645 (2d Cir. 1948) (alteration & internal quotation marks omitted); *see Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1089 (10th Cir. 2001) ("The rule of completeness . . . functions as a defensive shield against potentially misleading evidence proffered by an opposing party.").

We offer two examples of the operation of these principles in the context of the [          ] summaries. [


                    ]

    [




                    ]

J.A.C. (03-4162) 435. If Moussaoui designated the first sentence of this excerpt for inclusion in the substitutions, the rule of completeness would *not* allow the Government to include the second sentence. The second sentence neither explains nor clarifies the first; moreover, the second sentence is inadmissible because it is Witness A's speculation, not his personal knowledge.

Our second example also relates to Witness A's [          ] summaries:

[

]

*Id.* at 429. Suppose Moussaoui offered the following substitution based on the language of this paragraph:

[

]

This substitution could mislead the jury by implying that Witness A had a higher position in al Qaeda than he actually did. Accordingly, if Witness A's status in al Qaeda were relevant to an issue in the case, the rule of completeness would allow the Government to demand the addition of the phrases [        ] and [            ] to the proposed substitution.

In short, we wish to make clear that the rule of completeness is not to be used by the Government as a means of seeking the admission of inculpatory statements that neither explain nor clarify the statements designated by Moussaoui. On the other hand, the defense's ability to propose substitutions based on the language of the [          ] summaries is not a license to mislead the jury.

### b.   *CIPA*

On rehearing, both parties acknowledged our holding that CIPA does not apply here but indicated their belief that once the district court has approved substitutions for the witnesses' testimony, CIPA comes into play, with the result that the Government may object to the disclosure of the classified information in the substitutions and request that the district court adopt an alternative form of evidence. *See* 18 U.S.C.A. App. 3 § 6. We disagree.

It must be remembered that the substitution process we here order is a *replacement* for the testimony of the enemy combatant witnesses.

Because the Government will not allow Moussaoui to have contact with the witnesses, we must provide a remedy adequate to protect Moussaoui's constitutional rights. Here, that remedy is substitutions. Once Moussaoui has selected the portions of the [          ] summaries he wishes to submit to the jury and the Government has been given an opportunity to be heard, the district court will compile the substitutions, using such additional language as may be necessary to aid the understanding of the jury. Once this process is complete, the matter is at an end—there are to be no additional or supplementary proceedings under CIPA regarding the substitutions.

VI.

In summary, the judgment of the court is as follows. The January 30 and August 29 orders are affirmed, as is the rejection of the Government's proposed substitutions by the district court. The order imposing sanctions on the Government is vacated, and the case is remanded for the compiling of substitutions for the deposition testimony of the enemy combatant witnesses.

*AFFIRMED IN PART, VACATED IN PART,
AND REMANDED*

WILLIAMS, Circuit Judge, concurring:

At the outset, I concur in Part I of Chief Judge Wilkins's opinion, which includes the background information relevant to this appeal, and Part II, which describes our jurisdiction.

Turning to the substantive issue in this case, the Supreme Court has recently resolved the question of whether the district court has the authority to grant access to aliens detained abroad. In *Rasul v. Bush*, the Supreme Court held that § 2241 "draws no distinction between Americans and aliens held in federal custody" and that therefore "there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship." *Rasul v. Bush*, 124 S. Ct. 2686, 2696 (June 28, 2004). Moreover, the Court held that "Section 2241, by its terms, requires nothing more" than "the District Court's jurisdiction over petitioners' custo-

dian."[1] *Id.* at 2698. Accordingly, I concur in Parts III and IV of Chief Judge Wilkins's opinion.[2]

Thus, Moussaoui has a Sixth Amendment right to compulsory process of these witnesses because (1) under *Rasul*, the district court has the power to grant a testimonial writ directed to [          ] of these witnesses, and (2) Moussaoui has made a sufficient showing that the witnesses would provide material and favorable testimony based on the charges in the indictment. The Government, however, has refused to provide access to the witnesses. Although I am troubled by the lack of interactivity in the process that generated the substitutions,[3] that lack of interactivity is compelled by the substantial national security concerns surrounding these witnesses. I feel that in light of those concerns, the fact that the substitutions will not materially disadvantage the defendant — because he will be permitted to introduce every favorable statement from the witnesses while the Government will be precluded from introducing any inculpatory statements — adequately protects his Sixth Amendment rights. Accordingly, I concur in Part V of Chief Judge Wilkins's opinion.

---

[1]Section 2241 authorizes both the Great Writ, 28 U.S.C.A. § 2241(c) (1)-(4), and the testimonial and prosecutorial writs, 28 U.S.C.A. § 2241(c) (5). *See Carbo v. United States*, 364 U.S. 611 (1961) (tracing the history of the prosecutorial and testimonial writs). Section 2241(a) provides that the courts may grant a writ of habeas corpus, and section 2241(c) provides that the writ "shall not extend to a prisoner" unless certain circumstances exist, e.g., custody in violation of the Constitution or the need to bring the prisoner to testify or for trial. In its categorical holding in *Rasul v. Bush*, 124 S. Ct. 2686 (June 28, 2004), the Supreme Court makes no distinction between the different writs provided for by Section 2241. As the same statutory language in section 2241(a) authorizes both writs, I see no basis to distinguish the testimonial writ.

[2]I offer no opinion on whether the same result would obtain if Congress were to amend section 2241.

[3]I note that this lack of interactivity could be ameliorated in part by utilizing a process similar to that used by the 9/11 Commission.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I concur with my colleagues' conclusion that the witnesses at issue in this appeal could provide material, favorable testimony on Moussaoui's behalf. I further concur with their conclusion that the witnesses' overseas location does not preclude a finding that they are within the reach of the Compulsory Process Clause because they are, for purposes of this litigation, deemed to be [          ] of the United States. I wholeheartedly agree with my colleagues that the Government has an absolute right to refuse access to the witnesses on national security grounds; we shall not, indeed we must not, question the Government's determination that permitting the witnesses to be deposed would put our nation's security at risk. *See United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990) ("We are not asked, and we have no authority, to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security.") Further, as noted in the majority opinion, the district court correctly found that the proposed substitutions offered by the Government are not adequate to protect Moussaoui's right to a fair trial. However, as both the district court and the majority have recognized, the Government's refusal to comply with the district court's orders necessarily brings with it some consequences.[1] *See generally* Classified Information Procedures Act (CIPA), 18 U.S.C.A. app. 3, § 6(e)(2) (West 2000 & Supp. 2003) (providing for dismissal of indictment or other sanction upon Government's refusal to disclose classified information when ordered to do so by the district court);[2]

---

[1]To be clear: The consequences resulting from the Government's noncompliance are not intended as a penalty upon the Government. Rather, they are a means of protecting the rights of the Defendant, and of protecting the integrity of these judicial proceedings.

[2]I am troubled by the majority's conclusion that no CIPA-type review applies to the substitutions for the witnesses' testimony. The majority holds that the substitutions are not to be prepared by the Government, as is the practice anticipated by CIPA, but instead are to be compiled by the district court based on portions of the still-classified summaries designated by Moussaoui, to which the Government may object, but over which the Government has little control. *Moussaoui*, 365 F.3d at 315-16. Because the Government is not itself compiling the substitutions, it has no ability to ensure that the substitutions will not compromise national

*Jencks v. United States*, 353 U.S. 657, 670-71 (1957) (holding that the Government may "invoke its evidentiary privileges [to avoid public disclosure of highly sensitive material] only at the price of letting the defendant go free. . . . [S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.") (quoting *United States v. Reynolds*, 345 U.S. 1, 12 (1953)); *Fernandez*, 913 F.2d at 162-64 (affirming dismissal of indictment when Government elected not to disclose classified evidence that was material to the defense). The remedy proposed by the majority does not begin to vindicate Moussaoui's rights. Thus, it is in formulating the remedy for the Government's refusal to comply with the district court's order that I must part ways with the majority.[3]

The majority directs that the district court itself compile substitutions for the witnesses' potential testimony, using portions of the [          ] summaries designated by Moussaoui, subject to objection by the Government. The majority further instructs that only Mous-

_____

security. It may well be that Moussaoui will elect to include in the substitutions information that the Government deems highly classified. However, the majority has left the Government with no clear mechanism for mitigating the potential national security consequences of admission of Moussaoui's chosen portions of the summaries, other than the possibility of non-substantive changes to names, places, and the like. Although we cannot know at this juncture what materials might be included in the substitutions, or whether Moussaoui will in fact seek to admit the substitutions, it is foreseeable that the substantive information Moussaoui may seek to admit will include events that cannot be conveyed to the jury without jeopardizing national security, even if names or places are altered. This is just one of a series of instances of this court interceding in evidentiary matters that are properly the purview of the district court, a procedure that is sure to erode the district court's ability to carry out its constitutional mandate to ensure a fair trial.

[3]The usual remedy for the Government's failure to comply with a district court's disclosure order is dismissal of the indictment. *See, e.g.*, CIPA § 6(e)(2). However, like the majority and the district court, I believe that the ends of justice are best served by a circumspect exercise of discretion in creating an appropriate remedy.

saoui may admit into evidence, or elect not to admit, the substitutions, subject, of course, to the district court's ruling on admissibility. While I appreciate that the majority's solution to the difficult problem of ensuring Moussaoui's rights is an effort to put him as nearly as possible in the place where he would be if he were able to examine the witnesses, I respectfully suggest that this solution places the district court in a thoroughly untenable position. Moreover, this solution is contrary to CIPA's expectation that the Government shall provide proposed substitutions for classified information, and it essentially places the district court in the position of being an advocate in the proceedings.

Additionally, as the majority recognizes, because "many rulings on admissibility—particularly those relating to relevance—can only be decided in the context of a trial, most of the witnesses' statements cannot meaningfully be assessed for admissibility at this time." (Slip op. at 33). Asking the district court to pick and choose from among the summaries to compile substitutions for Moussaoui's use before the Government's evidence is forecast is a risky proposition at best. The [        ] summaries paint a complete, if disjointed, picture of the statements made by the witnesses to date; if the summaries are to be used as a substitution for the witnesses' testimony, they should be used in their entirety, subject to the district court's trial rulings on admissibility of any given passage to which either party objects, whether on hearsay grounds, as cumulative, as unduly prejudicial, or upon any other evidentiary basis.[4]

---

[4]I expect that we are setting ourselves out as super-arbiters of the admission of evidence in this case. If the district court overrules an objection by the Government to Moussaoui's proffered materials for inclusion in the substitutions, for example, it is fair to assume that the Government might seek to appeal the district court's ruling. Conversely, if Moussaoui seeks inclusion of material but the district court sustains the Government's objection to the evidence, Moussaoui may seek to appeal. The construct proposed by the majority will, I fear, lead to unnecessary piecemeal review of the district court's rulings with regard to the substitutions it has been tasked to prepare. Indeed, as if to underscore my concern, after we issued our first opinion in this appeal, the majority decided to implement a new evidentiary remedy for the denial of Moussaoui's Sixth Amendment rights before the ink was even dry on the court's previous opinion. This intrusion into the function of the district court belies our proper role as an appellate court.

Additionally, I disagree with the majority's decision to vacate the district court's order striking the Government's death notice at this juncture.[5]

In a prosecution under the Federal Death Penalty Act, 18 U.S.C.A. § 3591-3598 (West 2000 & Supp. 2003), the factfinder is required to consider whether any mitigating factors weigh against imposing a sentence of death. One potential mitigating factor specifically identified in the Act is the defendant's role in the offense:

> **(a) Mitigating factors.** —In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following:
>
> . . .
>
> > **(3) Minor participation.** —The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

18 U.S.C.A. § 3592(a)(3). In other words, if a defendant is guilty of an offense, but played a small part in it, the jury (or, in a bench trial, the judge) could find that he was not sufficiently culpable to warrant the imposition of the death penalty.

---

[5]The majority leaves open the possibility that if the substitutions compiled by the district court are inadequate, or if the jury is not properly instructed as to the circumstances of the substitutions and their reliability, the death notice could be stricken and other sanctions could be imposed. In my view, however, Moussaoui's inability to question the witnesses critically impairs his ability to prepare a defense, particularly (though not solely) as to a potential death sentence. Accordingly, as explained more fully below, if Moussaoui must proceed to trial on the basis of substitutions rather than the witnesses' testimony, as we all agree he must, the death penalty should be removed from the range of possible sentences Moussaoui may face.

Moussaoui argues that the witnesses could offer testimony that would show he did not participate in an act that directly resulted in death: they would testify, he contends, that he did not have an active role in the planned September 11 attack, nor did he know of the plan and fail to disclose that knowledge to investigators, who might have been able to use that knowledge to prevent the attack, when he was taken into custody and questioned prior to the attack. Moussaoui's theory of the case, as we understand it, is that even though he is a member of al Qaeda who has pledged his allegiance to Osama bin Laden, and even though he was willing to engage in terrorist acts, and was indeed training to participate in terrorist acts, he was not involved in the terrorist acts that occurred on September 11, 2001, nor did he know of the plans before the attack took place. Instead, his participation was to involve later attacks, attacks that may or may not have been planned to occur in the United States or against this country's interests abroad. We cannot know to any degree of certainty whether the witnesses at issue would absolve Moussaoui of any responsibility for any part of the September 11 operation, or knowledge of the planned attack, nor do we know if a jury would find credible any such testimony. However, because the Government has exercised its right to preclude Moussaoui from examining the witnesses, and based on the [            ] summaries in the present record, we must assume for present purposes that they would so testify.

Even if Moussaoui is permitted to admit substitutions derived from the [            ] summaries, those substitutions cannot be considered a functional equivalent of live (or deposition) testimony, nor are they adequate or sufficient to substitute for testimony. *Cf. Old Chief v. United States*, 519 U.S. 172, 187-89 (1997) (recognizing that stipulation "may be no match for the robust evidence that would be used to prove" the stipulated fact). Because the summaries are not responses to the questions that Moussaoui would ask if given the opportunity to depose the witnesses, and because the jury will not be able to see the witnesses and judge their credibility, use of the summaries will necessarily place severe limits on the evidence Moussaoui can present in his defense, particularly during the penalty phase of a capital proceeding. The ultimate question that must be resolved to determine whether Moussaoui is eligible for the death penalty is this: Did he participate in the September 11 attack, or know of the attack in advance? If Moussaoui cannot ask this question of the witnesses who have direct

knowledge, he is undeniably and irretrievably handicapped in his ability to defend himself from a sentence of death. The Government may argue that no one, other than Moussaoui himself, has stated he was not involved. Moussaoui has no access to those who could exonerate him from death eligibility, and the jury will not have any evidence upon which to base a finding in this regard except, possibly, for Moussaoui's own testimony, which he is not obligated to provide. Moussaoui will not be able to offer the most relevant evidence with which he might be able to avoid the death penalty.

After we issued our opinion, the Government filed a letter dated May 12, 2004, purporting to "clarify certain factual matters." In that letter, the Government stated that this court's opinion erroneously relied on a presumption that the Government's attorneys had not been privy to, nor had any input into, the [          ] witnesses at issue. The Government had argued, in both the district court and this court, that Moussaoui could not question the witnesses because any interference in the [          ] process would be devastating to national security. [

] (*United States v. Moussaoui*, No. 03-4162, Gov't Supp. Ex Parte Appx., at 8). The Government now concedes in the May 12 letter that members of the prosecution team have in fact [

] pertaining to the prosecution of Moussaoui. [

] (Gov't Ex Parte Appx. on Rehearing, at 63). While the May 12 letter does not necessarily contradict the Government's previous pleadings and statements during oral argument, it is easy to see why the court concluded, based on the Government's prior representations, [

] information with actionable foreign intelligence value, [          ] that information is passed

to the prosecutors, who in turn will pass the information to Moussaoui's defense team in accordance with their obligation under *Brady v. Maryland*, 373 U.S. 83 (1963). Until now, no parallel access to the [                              ] process has been available to Moussaoui.

The Government's May 12 letter, and its positions taken during the hearing before the panel on June 3, 2004, only serve to reinforce my conclusion that the district court was correct in holding that the death penalty should not be within the range of sentencing options available when, as here, the Defendant's ability to mount a defense is severely impaired. As the Government has made clear, the summaries of witness statements provided to the defense are not a complete account of the witnesses' responses [          ] the only [       ] responses passed to the prosecution, and subsequently provided to the defense, are those responses deemed [          ] to have actionable foreign intelligence value. Thus, as the majority acknowledges, it is certainly possible that the witnesses, [              ] may have provided information that, although exculpatory as to Moussaoui, was not passed on to the prosecution, and in turn to the defense team, because [          ] the information had no actionable foreign intelligence value.[6] As the majority further recognizes, if [          ] have exculpatory evidence that they have not passed on to the prosecution, Moussaoui's due process rights may be implicated. *See United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991) (stating that the prosecution is obligated under *Brady* to disclose all exculpatory evidence "in the possession of some arm of the state"); *see also Kyles v. Whitley*, 514 U.S. 419, 427-38 (1995) (noting the prosecutor's duty to learn of, and disclose, exculpatory evidence "known to the others acting on the government's behalf in the case, including the police"). The majority downplays this possibility, calling it unlikely, and states

---

[6]Although the prosecutorial function is to achieve justice, and as such prosecutors must seek out both inculpatory and exculpatory evidence, the Government makes clear that [

] (May 12 letter, at 3). [              ] have no duty [          ] exculpatory evidence unless that evidence would have actionable foreign intelligence value. Accordingly, even though [          ] "have a profound interest in obtaining truthful information," (Slip op. at 48, n.31), they do not have an interest in ensuring that justice is achieved in this case.

that it need not be further explored because "there is no evidence before us that the Government possesses exculpatory material that has not been disclosed to the defense." (Slip op. at 17, n.14). This conclusion is, at best, misguided. Because of the highly classified nature of the evidence at issue in this case, there is no way this court or Moussaoui could know whether an arm of the Government possesses exculpatory evidence that does not have foreign intelligence value; indeed, even the prosecution would not have access to any such evidence, [           ] distribute only those witness summaries that have foreign intelligence value. How there could ever be any evidence before us from which we could conduct a *Brady* analysis under these circumstances is a mystery.

Further, the reliability (or lack thereof) of the witnesses' statements poses real stumbling blocks to the admission of those statements. The Government admits that the summaries are simply accurate reflections of the witnesses' responses [           ] However, we do not have all of the witnesses' statements; instead, we are privy only to those portions of their statements that are deemed to have actionable foreign intelligence value. We do not have [           ] we do not have [           ] we do not know [           ] Although the Government assures us that the statements have some

[

]

indicia of reliability [

] Without this context, however, we have only the bare state-ment, which the jury may consider to be true [                    ] This is a slim reed indeed upon which to base a jury verdict, especially where a man's life hangs in the balance.

I cannot disagree with the majority's statement that "[b]ecause the Government will not allow Moussaoui to have contact with the wit-nesses, this court must provide a remedy adequate to protect Mous-saoui's constitutional rights." (Slip op. at 55). However, the majority's effort to craft such a remedy rings hollow. The majority boldly states that "input by the prosecution team into the [      ] process has worked no unfairness on Moussaoui," but directs that, "to provide Moussaoui with the fullest possible range of information from the witnesses," the district court must permit Moussaoui to [

] (Slip op. at 49). To say this is a "remedy" must be of cold comfort to Moussaoui. Although he may propose [

] The entire process is cloaked in secrecy, making it difficult, if not impossible, for the courts to ensure the provision of Moussaoui's rights. Although the prosecution is laboring under the same con-straints [              ][8] Moussaoui has constitutional rights, not extended to the prosecution, that are implicated by this procedure. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present wit-nesses in his own defense."); *Washington v. Texas*, 388 U.S. 14, 19

---

[8]The prosecution has had one distinct advantage not afforded to Mous-saoui: it has been able to [          ] over the course of many months, [            ] which may have aided the shaping of its trial strategy. This fact alone belies the majority's assertion that no unfairness has befallen Moussaoui.

(1967) ("The right to offer testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. . . . This right is a fundamental element of due process of law."). Because the majority decrees that this so-called "remedy" will fulfill this court's obligation to protect Moussaoui's constitutional rights, today justice has taken a long stride backward.

To leave open the possibility of a sentence of death given these constraints on Moussaoui's ability to defend himself would, in my view, subvert the well-established rule that a defendant cannot be sentenced to death if the jury is precluded from considering mitigating evidence pertaining to the defendant's role in the offense. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 604, 608 (1978). *See also Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *United States v. Jackson*, 327 F.3d 273, 299 (4th Cir. 2003) ("During sentencing in a capital case, the factfinder may 'not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'") (quoting *Lockett*, 438 U.S. at 604). A sentence of death requires "a greater degree of reliability" than any lesser sentence. *Lockett*, 438 U.S. at 604 (citing *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976)).

Here, the reliability of a death sentence would be significantly impaired by the limitations on the evidence available for Moussaoui's use in proving mitigating factors (if he is found guilty). Although it has been repeated often enough to have the ring of cliché, death *is* different. It is the ultimate penalty, and once carried out, it is irrevocable. A sentence of death cannot be imposed unless the defendant has been accorded the opportunity to defend himself fully; it cannot be imposed without the utmost certainty, the fundamental belief in the fairness of the result. Because Moussaoui will not have access to the witnesses who could answer the question of his involvement, he should not face the ultimate penalty of death. Accordingly, I would uphold the district court's sanction to the extent that it struck the Government's death notice. On this basis, I must dissent.