GREGORY, Circuit Judge,
concurring in the judgment:
I join the per curiam opinion reversing and remanding the district court’s decision because “al-Marri has not been afforded sufficient process to challenge his designation as an enemy combatant.” (Per Cu- *277 riam Op. at 216). Further, I join in Judge Motz’s concurrence. While I respect the opinions and tireless work of my colleagues, I write separately to provide historical context and to express my intransigent belief that the Constitution requires a person detained in the United States under the Authorization for the Use of Military Force (“AUMF”) receive a determinate level of due process to justify the denial of his liberty. And it is the role of this Court to provide clear guidance as to the contours of that due process.
The horrific attack on 9/11 resulted in congressional passage of the AUMF, the most far-reaching bestowal of power upon the Executive since the Civil War. The AUMF authorizes the President to “use all necessary and appropriate force against ... persons” with a connection — however attenuated that connection may be — to the 9/11 attacks in order to “prevent any future [terrorist] attacks ... against the United States.” Pub.L. No. 107-40, 115 Stat. 224 (2001). As I discuss below, the AUMF punishes conduct, not status. Therefore, the location and citizenship of a putative enemy should be of no consequence in determining the level of due process that an enemy combatant detained in America under the AUMF, like al-Mar-ri, should receive.
The majority of my colleagues agree that a person of al-Marri’s status is entitled to more due process than that which he received, but unfortunately, there is no concrete guidance as to what further process is due. Little doubt exists that this judgment will leave the district court with more questions than answers. In deciding what this process should entail, the district court can find wise counsel in Supreme Court and Fourth Circuit precedent, including our decision in United States v. Moussaoui, 382 F.3d 453 (4th Cir.2004), and in the statutory framework Congress created for handling classified material in a judicial setting, the Classified Information Procedures Act (“CIPA”), 18 U.S.CApp. 3, §§ 1-16 (West 2000 & Supp. 2007).
I.
Every American, unless clearly abrogated by congressional act or deprived by due process of law, has a right to freedom — a right protected by the writ of ha-beas corpus.[1] Senator Arlen Specter, in introducing a bill to restore habeas corpus to all aliens detained within U.S. territory, reminded us that the venerated right to habeas corpus is “a right which has existed in Anglo Saxon jurisprudence since King John in 1215 at Runnymede.” 152 Cong. Rec. S 11196-01 (December 5, 2006). Indeed, the writ is so cherished that it has been referred to by Blackstone as “the most celebrated writ in the English law”, 3 William Blackstone, Commentaries *129, a reverence echoed by the Supreme Court. See Ex parte Bollman, 4 Cranch 75, 95, 2 L.Ed. 554 (1807) (describing the writ of habeas corpus as the “[Gjreat [W]rit.”)
Alexander Hamilton lauded “the establishment of the writ of habeas corpus” along with “the prohibition of ex-post-facto laws, and of TITLES OF NOBILITY” as the Constitution’s “greate[st] securities to liberty and republicanism.” The Federalist No. 84 (Alexander Hamilton) (emphasis in original); see also, Boumediene v. Bush, 128 S.Ct. at 2246 (“That the Framers considered the writ a vital instrument for the protection of individual liberty is evident *278 from the care taken to specify the limited grounds for its suspension!.]”). The broad language of the AUMF, literally construed, gives the President carte blanche to take any action necessary to protect America against any nation, organization, or person associated with the attacks on 9/11 who intends to do future harm to America. Nevertheless, nothing calls for the lifting of the Great Writ in the AUMF, in its legislative history, or even in congressional or presidential public statements. But, if we approved the “due process” al-Marri received, we would do precisely that.
When an American citizen[2] can be designated an enemy combatant, arrested by the military, and held incommunicado with no knowledge of the justification for his detention (other than a declaration from a government official who has no first-hand knowledge of the situation), it is not only al-Marri’s rights that are at stake, but rather the rights of every man, woman, and child who breathe the fragrant scent of liberty in this great land. I am cognizant that the Commander-in-Chief must be able to conduct a war without undue interference from a co-equal branch of government. Accordingly, I recognize the delicate constitutional balance that must be struck between military detention and the possibility of abridged due process proceedings during times of war. However, an independent judiciary is obliged to preserve the fundamental building blocks of our free society — in this case, the right to know why one has been deprived of his liberty and a fair opportunity to answer that charge. See Boumediene, 128 S.Ct. at 2244 (“The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom.”).
Our judgment today, while entitling al-Marri to an indeterminate measure of further due process, leaves much to be desired. Regrettably, the unvarnished result is that the AUMF authorizes the President to substitute the full protections of the Great Writ for any enemy combatant detained in the United States with an alternative due process framework tethered to mere suggestions.
The uncertain duration of this conflict— the seven-year anniversary of 9/11 is less than three months away-and the fact that America is not fighting a traditional nation-state means that the prospect of future al-Qaeda operatives entering the country for deleterious purposes is very real and ongoing with no foreseeable end. See Boumediene, 128 S.Ct. at 2262, 2270 (predicting that the war on terrorism may “last a generation or more” and noting that it is “already among the longest wars in American history”). It stretches the bounds of credulity to think that a Treaty of Versailles-esque ceremony will ever end all terrorist hostilities against the United States.
With this troubling thought in mind, I attempt to provide a legal framework to assist the district court in adjudicating this matter on remand.
II.
The factual circumstances underlying this case “are entirely unlike those of the conflicts that informed the development of the law of war,” Hamdi v. Rumsfeld, 542 U.S. 507, 521, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004), thus it is incumbent upon us to *279 outline the contours of the due process framework for the district court.[3] In doing so, we must respect the Framers’ decision to place the power to conduct a war in the hands of the Executive, see U.S. Const, art. II, § 2, cl. 1, but we must also recall the Supreme Court’s admonition that “a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.” Buckley v. Valeo, 424 U.S. 1, 121, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). This is particularly true when, as here, the situation demands adjudication. It is, without question, the sole province of the judicial branch to determine what process a person should receive. See Boumediene, 128 S.Ct. at 2259 (holding that “the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers”). As we pointed out in United States v. Moussaoui, 382 F.3d 453, 469 (4th Cir.2004):
This is not a case involving arrogation of the powers or duties of another branch. The district court orders requiring production of the enemy combatant witnesses involved the resolution of questions properly-indeed, exclusively-reserved to the judiciary. Therefore, if there is a separation of powers problem at all, it arises only from the burden the action's of the district court place on the Executive’s performance of its duties.
Accordingly, the separation of powers issue is of no moment here as the remand requires the district court to perform a purely judicial function: determine which evidence the Government must turn over to al-Marri. Moreover, as we have seen in Moussaoui, and more recently in United States v. Abu Ali, 528 F.3d 210 (4th Cir.2008), the question of whether that evidence is publicly disclosable is of little relevance. Rather, the pertinent question is whether al-Marri will be able to review such evidence, and if so, in what form that evidence will be presented.
A.
While Judge Traxler states that “it is likely that the constitutional rights our court determines exist, or do not exist, for al-Marri will apply equally to our own citizens under like circumstances” ante at 276 (Traxler, J., concurring in judgment) (emphasis added), it is beyond peradventure that the Constitution will furnish an American citizen, detained under these circumstances, no more rights than those we provide al-Marri. Indeed, any other result would be inconsistent with the very text of the AUMF and the Constitution. After Hamdi, we decided Padilla v. Hanft, 423 F.3d 386 (4th Cir.2005), where we explained that the “distinction between an enemy combatant captured abroad and detained in the United States, such as Ham-di, and an enemy combatant who escaped capture abroad but was ultimately captured domestically and detained in the United States, such as Padilla” is insignificant when determining who is an enemy combatant. Id. at 393. Though we did not address the issue of what process, if any, the Constitution owed Padilla, his arrest in the United States entitled him to the same level of process that al-Marri should receive.
As the district court recognized, the Hamdi plurality set out some guideposts for determining the due process rights of an enemy combatant. Most importantly, *280 the Supreme Court held that “a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice ... and a fair opportunity to rebut the Government’s factual assertions[.]”. Hamdi, 542 U.S. at 533, 124 S.Ct. 2633 (emphasis added). The circumstances underlying al-Marri’s detention, when juxtaposed with the facts in Moussaoui, Padilla, and Abu Ali, and with the Executive’s decision as to which of them should be designated enemy combatants, inform my view as to what is “fair” in this case.
The Executive’s process for designating an al-Qaeda operative an enemy combatant has very real legal consequences. Padilla, Moussaoui, and Abu Ali, all al-Qaeda operatives bearing the trademarks of an enemy combatant, were charged, like al-Marri, in the civilian criminal system. Unlike al-Marri, however, the Executive allowed the other defendants to proceed in civilian criminal trials for reasons that are unknown.
In Padilla, the Executive’s decision to designate Padilla as an enemy combatant upon his arrest gave credence to that decision. Foregoing any discussion of due process, we held that “the availability of criminal process cannot be determinative of the power to detain,” Padilla, 423 F.3d at 394, because detention prevented the enemy combatant from “return[ing] to the field of battle.” Id. at 395. Moreover, if Padilla was not detained, “criminal prosecution would impede the Executive in its efforts to gather intelligence from the detainee and to restrict the detainee’s communication with confederates so as to ensure that the detainee does not pose a continuing threat to national security even as he is confined.” Id. Given these justifications, the Executive’s subsequent decision to transfer Padilla from military to civilian custody on the eve of the Supreme Court’s review of our decision came, in this Court’s view, at a “substantial cost to the government’s credibility before the courts,” Padilla v. Hanft, 432 F.3d 582, 585-86 (4th Cir.2005) because:
we would regard the intentional mooting by the government of a case of this import out of concern for Supreme Court consideration not as legitimate justification but as admission of attempted avoidance of review. The government cannot be seen as conducting litigation with the enormous implications of this litigation — litigation imbued with significant public interest — in such a way as to select by which forum as between the Supreme Court of the United States and an inferior appellate court it wishes to be bound.
Though much of the Government’s evidence against Padilla, Moussaoui, and Abu Ali remains classified, the sheer volume of that evidence is overwhelming.[4] Beyond the Rapp Declaration, the Government turned nothing over to al-Marri. Therefore, at this stage, it is impossible to determine if evidentiary concerns played any role in the Executive’s decision to designate al-Marri an enemy combatant.
Al-Marri was arrested and imprisoned for eighteen months in the civilian criminal system, and with less than one month before the commencement of his trial, the Executive authorized al-Marri’s transfer to military custody. Just as we expressed our skepticism with the Government’s at *281 tempt to transfer Padilla from the military to the civilian criminal system three and a half years after his initial detention, the Executive’s decision to designate al-Marri an enemy combatant on the very eve of his civilian criminal trial raises a similar concern.
B.
While the Hamdi court held that “full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting,” Hamdi, 542 U.S. at 535, 124 S.Ct. 2633 (emphasis added), this may not be the case for al-Marri. Determining the “workability” of providing al-Marri with first-hand evidence to support the Rapp Declaration is critical, especially in light of the harsh conditions to which enemy combatants are subject. As my colleagues point out, al-Marri was neither arrested on the battlefield in some far-flung location nor were his alleged criminal activities centered abroad. Moreover, from the information available to us, al-Marri’s crimes relate to defrauding American financial institutions and lying to American law enforcement. Nothing in the record undermines al-Marri’s contention that the majority of evidence relied upon by the Government is in the possession of U.S. governmental agencies. If this proves to be the case, obtaining such evidence should be “workable,” and “fairness” requires an in-camera, ex-parte review of such evidence. See Boumediene, 128 S.Ct. at 2275 (“Practical considerations and exigent circumstances inform the definition and reach of the law’s writs, including habeas corpus.”).
During this in-camera, ex-parte proceeding, the Government could present evidence supporting the allegations against al-Marri and would presumably make its case for keeping such evidence from him. The district court would then decide which evidence is “appropriate” for al-Marri to review, and subsequently, provide a rationale as to why any remaining evidence is “inappropriate.” In fashioning the process by which the district court should make its evidentiary determination, we need not develop a framework from whole cloth. Supreme Court and Fourth Circuit precedent, when considered alongside CIPA, provides the Judiciary with a step-by-step guide for balancing the national security interests of the country with individual due process rights.
C.
In Abu Ali, we presciently set forth the following statement on the treatment of terrorists in our criminal system:
Persons of good will may disagree over the precise extent to which the formal criminal justice process must be utilized when those suspected of participation in terrorist cells and networks are involved. There should be no disagreement, however, that the criminal justice system does retain an important place in the ongoing effort to deter and punish terrorist acts without the sacrifice of American constitutional norms and bedrock values. As will be apparent herein, the criminal justice system is not without those attributes of adaptation that will permit it to function in the post-9/11 world. These adaptations, however, need not and must not come at the expense of the requirement that an accused receive a fundamentally fair trial[5]
*282 Abu Ali, 528 F.3d at 221 (emphasis added). Our judicial system is well-equipped to handle classified material efficiently and to balance an accused’s right to review evidence against national security interests. In Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court “dictate[ed] that the process due in any given instance is determined by weighing the private interest that will be affected by the official action against the Government’s asserted interest, including the function involved and the burdens the Government would face in providing greater process.” Hamdi, 542 U.S. at 529, 124 5.Ct. 2633 (internal quotation marks and citation omitted). Because much of the evidence al-Marri requests may be readily available, assuming that evidence would not compromise the Executive’s ability to wage war, the Government should provide it to the district court.
i.
The Mathews calculus, albeit helpful, leaves many questions unanswered, particularly those concerning how the district court should assess the classified information’s relevance. “In the area of national security and the government’s privilege to protect classified information from public disclosure, we [have] look[ed] to CIPA for appropriate procedures.” Abu Ali, 528 F.3d at 245. Prior to CIPA’s enactment, the Government was placed in the unenviable position of “abandoning] prosecution rather than risk possible disclosure of classified information.” Id. (internal quotation marks and citation omitted). By structuring a framework for evaluating the use and admissibility of classified evidence without public disclosure, CIPA alleviates this dilemma. It provides that any hearing conducted “shall be held in-camera” if the Attorney General provides the court with reasons for why “that public proceeding may lead to the disclosure of classified information.”[6] 18 U.S.C.App. § 6(a).
Section 6 of CIPA sets out a clear procedure for the district court to utilize in handling classified evidence and determining its “use, relevance and admissibility.” 18 U.S.C.App. § 6(a). If the district court finds the classified information relevant and material, CIPA requires that the district court give it to the accused unless an adequate substitute can be provided. See Moussaoui, 382 F.3d at 476. In determining the accessibility of such information, the district court should “take[] cognizance of both the state’s interest in protecting national security and the defendant’s interest in receiving a fair trial.” United States v. Fernandez, 913 F.2d 148, 154 (4th Cir.1990).
When weighing the competing interests of the Government and the accused, common law privileges protecting the disclosure of evidence continue to apply. See United States v. Smith, 780 F.2d 1102, 1107 (4th Cir.1985) (en banc). Thus, common law privileges protecting classified information from disclosure on account of military or state secrets remain applicable. However, in the context of CIPA, we held that privilege would “give way” if the classified information “is relevant and helpful to the defense of an accused or is essential to a fair determination of a cause.” Id. at 1107 (internal quotation marks and citation omitted) (emphasis added).
ii.
CIPA provides the accused with access to classified documents, not witnesses. Nevertheless, in Moussaoui, we held that, *283 while CIPA was not directly applicable, it “provides a useful framework for considering the questions raised by Moussaoui’s request for access to the enemy combatant witnesses.” Moussaoui, 382 F.3d at 472 n. 20. Similarly, CIPA is not directly applicable to al-Marri’s case because he is not entitled to the “equivalent of a full blown” criminal trial. Hamdi, 542 U.S. at 524, 124 S.Ct. 2633. Yet, CIPA can certainly guide the district court’s consideration of al-Marri’s evidentiary requests especially given that al-Marri primarily requests documents.
Additionally, we held that Moussaoui should have qualified access to material enemy combatant witnesses and their pri- or statements. In order to establish the witnesses’ relevance, he only had to make a “plausible showing” of materiality. Moussaoui, 382 F.3d at 472 (internal quotation marks and citation omitted). As al-Marri will likely be placed in the same evidentiary quandary as Moussaoui — i.e., no direct access to enemy combatant witnesses — he should likewise be held to the same lower threshold in establishing the materiality of witnesses. Further, we also held that substituting actual testimony from enemy combatants with an alternative procedure should “be an interactive process among the parties and the district court.” Id. at 480. Recognizing that “the burdens that would arise from production of the enemy combatant witnesses are substantial,” id. at 471, there are times when such evidence, even via an affidavit, will be necessary to substantiate the Government’s evidence.
As a practical matter, this process could take place in an in-camera, ex-parte hearing where the Government responds to al-Marri’s requests for information and explains why national security concerns preclude disclosing evidence. While some of al-Marri’s requests, such as to depose high-level members of the Executive, may indeed prove onerous, Moussaoui is an excellent template for the district court. It demonstrates how, in consultation with the relevant parties, a court can craft remedies that satisfy an enemy combatant’s unique evidentiary requests without unduly burdening the Government or compromising national security. Ultimately, in giving al-Marri a “fair opportunity” to dispute his designation as an enemy combatant, the district court should “seek a solution that neither disadvantages [al-Marri] nor penalizes the government (and the public) for protecting classified information that may be vital to national security.” Id. at 477.
III.
If our remand is to be meaningful, the district court must demand evidence supporting the veracity of the Rapp Declaration. Presumably, al-Marri’s civilian grand jury reviewed material portions of al-Marri’s file prior to his classification as an enemy combatant. Common sense leads to the conclusion that many of the documents al-Marri requests are located here in the United States. As we set out in Moussaoui and Abu Ali, should the Government object to turning over documents on the basis of national security concerns, the district court has a very specific federal statute, CIPA, to guide its determination of what documents can be turned over to al-Marri. In addition, the Supreme Court’s decisions in Mathews and Hamdi provide the appropriate balance that the district court should strike upon reviewing such evidence.
In this time of angst and fear, we can find solace and wisdom in the words of Thomas Jefferson — words that have kept our nation’s focus on noble principles in the worst of times. Speaking at his First Inaugural, Jefferson included the “protec *284 tion of habeas corpus” among those “principles [which] form the bright constellation which has gone before us and guided our steps through an age of revolution and reformation ... and should we wander from them in moments of error or of alarm, let us hasten to retrace our steps and to regain the road which alone leads to peace, liberty, and safety.” Thomas Jefferson, First Inaugural Address, March 4, 1801. I urge the district court to “retrace our steps” as it considers this case on remand.

. The Great Writ originally concerned whether the court had jurisdiction, see e.g., Ex parte Watkins, 28 U.S. 193, 3 Pet. 193, 7 L.Ed. 650 (1830), but it has "evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law.” Preiser v. Rodriguez, 411 U.S. 475, 485, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

. As I explain below, while al-Marri is not an American citizen, that distinction is insignificant under the AUMF, and the rights al-Marri receives will no doubt be the standard by which we measure the due process rights of all enemy combatants detained in the United States.

. The din of my good colleagues urging an incremental due process approach is problematic because "the relevant language in Hamdi did not garner a majority of the Court.” Boumediene, 128 S.Ct. at 2269.

. For example, the Government ultimately provided Moussaoui "with millions of pages of documents, including more than 166,000 FBI interview reports and over 1.7 million pages of documents from the FBI’s ongoing criminal investigation of the September 11 attacks (the PENTTBOM investigation). In addition, the Government provided a number of other evidentiary materials, such as audio and video tapes and grand jury information." United States v. Moussaoui, 483 F.3d 220, 224 (4th Cir.2007).

. Like Moussaoui, Abu Ali was tried in the civilian judicial system. Because both Abu Ali and Moussaoui could have been detained under the AUMF, I find that the process provided to them is informative.

. Section 6 also allows the district court to seal the records from any in-camera proceedings. 18 U.S.C.App. § 6(d).